Michael Dell'Angelo (Bar No. 32581997)
Andrew Abramowitz
James Maro
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
aabramowitz@bm.net
jmaro@bm.net

*Counsel for Plaintiff and the Putative Class*

[Additional Counsel Listed Below]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RYAN SHULMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BRADLEY WESTON and TODD VOGENSEN,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................................1

JURISDICTION AND VENUE .........................................................................................7

PARTIES ............................................................................................................................7

    A.    Plaintiff...................................................................................................................7

    B.    Defendants..............................................................................................................8

    C.    Relevant Non-Party ..............................................................................................9

SUBSTANTIVE ALLEGATIONS ...................................................................................10

    A.    False and Misleading Statements and Omissions During the Class Period...................10

        1.    Misstatements in the Q3 2022 Form 10-Q.............................................10

        2.    Misstatements in Sarbanes-Oxley Certifications Signed by Defendants Weston and Vogensen...............................................................................12

        3.    Misstatements by Defendants Weston and Vogensen in the Q3 2022 Earnings Call........................................................................................14

    B.    The Truth Begins to Emerge ...............................................................................15

        1.    The Bankruptcy Proceedings Reveal Previously Concealed Shortfalls in Party City's Liquidity Position and Borrowing Capacity .........................15

        2.    Party City's Announcement of a "Going Concern" Disclosure Failure, Material Weakness in Internal Control, and E&Y's Resignation ............................20

    C.    GAAP Standards Governing Going Concern Issues Required Party City to Analyze the Exact Information It Ignored ..................................................24

    D.    Scienter................................................................................................................25

    E.    Loss Causation......................................................................................................28

CLASS ACTION ALLEGATIONS ..................................................................................30

APPLICABILITY OF THE PRESUMPTION OF RELIANCE .......................................33

NO SAFE HARBOR ........................................................................................................35

CAUSES OF ACTION .....................................................................................................36

        COUNT I: Violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 Thereunder (17 C.F.R. § 240.10b-5)....................................36

COUNT II: Violation of Section 20(a) of the Exchange Act (15 U.S.C. § 78t)................38

PRAYER FOR RELIEF .................................................................................................................39

JURY TRIAL DEMAND ..............................................................................................................39

Plaintiff Ryan Shulman ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon an investigation by his counsel, which included analysis of: (i) regulatory filings by Party City Holdco Inc. ("Party City" or the "Company") filed with the U.S. Securities and Exchange Commission ("SEC"); (b) bankruptcy filings in the matter captioned *In re: Party City Holdco Inc*., Dkt. No. 23-90005 (Bankr. S.D. Tex.); (c) press releases and other public statements disseminated by Party City; (d) transcripts of earnings calls between Party City executives and securities analysts; (e) media coverage concerning Party City; and (f) other publicly available information relevant to the matters set forth herein.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all persons and entities that purchased or otherwise acquired Party City securities between November 8, 2022 and June 9, 2023, inclusive (the "Class Period").

2.      These proceedings arise from Party City's material misrepresentations and omissions about its liquidity, the adequacy of its borrowing capacity, and its ability to continue as a going concern.

3.      Plaintiff pursues claims against defendants Bradley Weston and Todd Vogensen ("Defendants") under the Securities Exchange Act of 1934 ("Exchange Act"). Defendant Weston was Party City's Chief Executive Officer ("CEO") at all relevant times. Defendant Vogensen was Party City's Chief Financial Officer ("CFO") at all relevant times. Party City is not a named defendant herein in light of its ongoing bankruptcy and the resulting stay of litigation.

4.      Party City sells party goods, costumes, decorations, and related items through retail and wholesale channels, primarily in North America. The Company's retail operations consist of 830 party supply stores operating under the names Party City and Halloween City. Its

1

retail sales also include sales through its e-commerce websites, principally PartyCity.com. Its wholesale operations include designing, manufacturing, and distributing party goods whereby the items are sold to retail outlets such as independent party supply stores, grocery stores, dollar stores, and third-party e-commerce merchandisers.

5.      On November 8, 2022, the first day of the Class Period, Party City filed a Form 10-Q with the SEC for the third quarter ended September 30, 2022 (the "Q3 2022 10-Q"). The Q3 2022 10-Q included multiple misleading statements about the Company's liquidity position, capital resources, and borrowing capacity. For example, the Company stated: "We expect to rely on cash on hand, cash generated by operations, and borrowings available under our credit agreements to meet our working capital needs, and [those] will be our principal sources of liquidity. . . . [W]e believe that **these sources will be adequate to meet our liquidity needs for at least the next 12 months**."[1] The Company also stated that it has "available borrowings of $91.7 million" under its credit agreements, meaning it could draw an additional $91.7 million from its credit lines if necessary. The Company further stated that it had "total liquidity of $121.5 million" at September 30, 2022, consisting of $29.8 million in cash on hand plus the $91.7 million of available borrowings under its credit agreements. In these statements in connection with Q3 2022, the Company gave no indication that it was facing a liquidity shortfall, that its borrowing capacity was insufficient to satisfy its cash needs, and that it was unable to locate lenders willing to provide additional loans. Also, importantly, it omitted that there was a substantial doubt about its ability to continue as a going concern.

6.      Ten weeks later, on January 17, 2023, Party City abruptly filed bankruptcy. The Company explained in its bankruptcy filings that the need to file bankruptcy arose from the

---

[1] Unless otherwise noted, all emphasis herein is added.

Company's ongoing liquidity shortfall, its need for additional loans beyond the credit lines available to it, and its inability to locate lenders willing to provide additional loans, issues which had not been disclosed to investors.

7.    Information disclosed in the bankruptcy filings indicates that Party City was well aware of its liquidity problems and lending shortfalls for several months, dating back to *before* it filed its Q3 2022 10-Q. The Company nevertheless omitted those issues in its Q3 2022 10-Q. For example, an agent for Party City filed a Declaration (the "Keil Decl.") in the bankruptcy proceedings stating in relevant part:

> Moelis [a financial advisory firm] has been engaged by the Debtors [Party City] to provide financial advisory and investment banking advice **since early 2020** and has worked with the Debtors to identify potential solutions to address financial challenges facing the business, including its highly leveraged capital structure, sizeable debt servicing obligations including significant interest payments and near-term maturities, and ongoing liquidity tightness driven in part by the Debtors' capital structure, continuing operational challenges and macroeconomic factors.
>
>                                  . . . .
>
> Recent efforts to address the Debtors' capital structure and identify attractive sources of incremental liquidity have been challenged due to inflation, macroeconomic headwinds, the bull-whip effect from supply chain difficulties, global helium supply challenges and the numerous other challenges facing many retailers today. These challenges led to the Debtors materially underperforming expectations **since early 2022**.
>
> As these financial challenges persisted through the **third . . . quarter[] of 2022**, . . . it became apparent that **refinancing and capital raising transactions would not adequately address the Debtors' capital structure challenges** . . . .
>
>                                  . . . .
>
> Over the **past several months**, including **well in advance of the Debtors' decision to pursue a holistic balance sheet restructuring [via bankruptcy]**, the Debtors . . . have made significant efforts to secure financing and capital needed

to address the Debtors' liquidity challenges . . . .[2]

8.      Despite Party City's then-existing knowledge of severe liquidity problems and

lending shortfalls as of September 30, 2022, the Company did not disclose those adverse facts in

the Q3 2022 10-Q or any subsequent SEC filings leading up to its bankruptcy. As a result, from

the beginning of the Class Period through the date of bankruptcy, investors purchased Party City

stock without any knowledge of important adverse facts bearing on the Company's liquidity

problems and inability to obtain new badly needed loans.

9.      Information disclosed in the bankruptcy filings further indicates that Party City

intentionally delayed publicly disclosing its liquidity problems and lending shortfalls due to

concern about how its vendors and other stakeholders would react to the negative news.

According to the Keil Declaration, the Company feared that disclosure would trigger a "crisis in

vendor confidence, resulting in a significant tightening of trade terms."[3] Similarly, according to a

Declaration by another agent of Party City (the "Orlofsky Declaration"), "a mere perception

among the Debtors' stakeholders . . . [of] any serious doubt that the Debtors are sufficiently

capitalized and liquid to continue as a going concern, could result in [a] vicious cycle [of

negative consequences]."[4]

10.      On June 9, 2023, the last day of the Class Period, Party City filed a Form 8-K

with the SEC revealing that the Company's independent audit firm Ernst & Young LLP

("E&Y") resigned as its auditor due to a disagreement about the Company's decision not to

---

[2] Declaration of Adam Keil at ¶¶ 7-9, 12, Jan. 18, 2023, Bankr. Dkt. No. 12, *available at* https://cases.ra.kroll.com/PCHI/Home-DownloadPDF?id1=MjMzOTM2Nw==&id2=-1.

[3] Keil Decl. ¶ 19, *supra*.

[4] Declaration of David Orlofsky at ¶ 61, Jan. 18, 2023, Bankr. Dkt. No. 11, *available at* https://cases.ra.kroll.com/PCHI/Home-DownloadPDF?id1=MjMzOTM2Ng==&id2=-1.

include a "going concern" warning in the Q3 2022 10-Q. The going concern warning would have

alerted investors that there was substantial doubt about the Company's ability to continue as a

going concern for the next twelve months. The Form 8-K stated in relevant part:

> On June 5, 2023, the Audit Committee . . . of Party City Holdco Inc. (the "Company") received a letter from Ernst & Young LLP ("EY") stating that **EY had resigned as the Company's independent registered accounting firm** for the year ended December 31, 2022.
>
> . . . .
>
> In its resignation letter, . . . **EY concluded that the Company ought to have disclosed in the financial statements in the Company's quarterly report on Form 10-Q for the period ended September 30, 2022 (the "Third Quarter Form 10-Q") that there was substantial doubt regarding the Company's ability to continue as a going concern within one year, resulting in a material error in such financial statements** . . . .
>
> . . . .
>
> As a result of the Company's failure to disclose in the Third Quarter Form 10-Q that there was substantial doubt about the Company's ability to continue as a going concern, . . . the . . . **financial statements included within the Third Quarter Form 10-Q should no longer be relied upon**. The Audit Committee further determined that the **Third Quarter Form 10-Q should be restated**.

11.     The Form 8-K also revealed that there was a "material weakness in internal

control over financial reporting" as of the date of the Q3 2022 10-Q, which led to the failure on

the part of the Company and Defendants to include the going concern warning in that quarterly

filing. Specifically, the Form 8-K stated:

> **[T]he Company identified a material weakness in internal control over financial reporting . . . as of November 8, 2022, the date the Company filed the Third Quarter Form 10-Q**. Under ASC 205-40, the Company has the responsibility to evaluate whether conditions and/or events raise substantial doubt about its ability to meet its obligations as they become due within one year after the date that the financial statements are issued. In re-performing this evaluation as of the date of the filing of the Third Quarter Form 10-Q, the Company concluded that there was substantial doubt about the Company's ability to continue as a going concern.

12.     Investors were previously unaware that there was a substantial doubt about the Company's ability to continue as a going concern. Even when the Company filed bankruptcy, its filings cast the liquidity issues as matters that would be resolved by additional financing to be obtained in the bankruptcy proceedings. The bankruptcy is a Chapter 11 restructuring rather than Chapter 7 liquidation, meaning the Company will remain operational as a result of the restructuring. Thus, the going concern revelation in the Form 8-K was important additional news that shed light on the extent of the Company's liquidity problems and credit facility shortfalls.

13.     Investors were also unaware, prior to the filing of the Form 8-K, that there was a material weakness in the Company's internal controls as of September 30, 2022, and that the financial statements in the Q3 2022 10-Q should no longer be relied on. This too was important additional news, given that the Q3 2022 10-Q was the operative SEC filing from the date it was issued to the date the Form 8-K was filed seven months later. The Company had not issued any other quarterly or annual SEC filings during that period.

14.     Thus, even Class Members who purchased Party City stock from the bankruptcy date to the date the Form 8-K was filed continued to be deceived by the misleading statements and omissions in the Q3 2022 10-Q. During that period, investors were left to rely on the Q3 2022 10-Q in making investment decisions, without knowing that it contained materially false and misleading information.

15.     In sum, throughout the Class Period, Defendants made or caused to be made misleading statements and omissions concerning the Company's true financial strength. Specifically, in the Q3 2022 10-Q, the Company: (i) affirmatively misrepresented that its capital resources "will be adequate to meet our liquidity needs for at least the next 12 months"; (ii) omitted that there was substantial doubt about the Company's ability to continue as a going

concern; (iii) downplayed the nature and extent of the Company's then-existing liquidity problems; (iv) omitted that the Company's existing credit facilities were insufficient to satisfy its operational needs and that it was unable to obtain additional loans in the normal course of business; and (v) omitted that there was a material weakness in its internal control over financial reporting.

16.    As a result of these misleading statements and omissions, the Company's stock price was artificially inflated throughout the Class Period. When the truth was revealed through a series of corrective disclosures, the Company's stock price declined, causing compensable damages to Plaintiff and the Class.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18.    This Court has federal question jurisdiction over the subject matter of the action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Party City's principal executive offices are located in New Jersey, and many of the acts alleged herein, including the preparation and dissemination of false and misleading information in the Q3 2022 10-Q, occurred in substantial part in this District.

20.    In connection with the unlawful conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

**A.    Plaintiff**

21.    Plaintiff Ryan Shulman is a resident of Fort Lauderdale, Florida. Plaintiff purchased 70,000 shares of Party City common stock on February 1, 2023 at a total cost of $10,029. A chart setting forth Plaintiff's transactions in Party City stock during the Class Period is set forth in the accompanying Certification.

**B.    Defendants**

22.    Defendant Bradley Weston was Party City's CEO at all relevant times. Defendant Weston signed a "Certification . . . Pursuant to . . . the Sarbanes-Oxley Act" attached to the Q3 2022 10-Q which stated that the Q3 2022 10-Q did not contain any material misrepresentations or omissions and that Defendant Weston was responsible for maintaining the Company's internal controls over financial reporting.

23.    Defendant Weston earned a base salary of $1,050,000 and incentive-based cash bonus of $1,561,368 in fiscal 2021, the most recent year for which compensation data is publicly available.[5] Defendant Weston also held 1,065,164 shares of the Company's common stock on April 11, 2022, the most recent date for which his aggregate holdings are publicly available.[6] Those shares were valued at $3.7 million on that date based on the NYSE closing price of $3.50 per share on April 11, 2022. In light of his significant stock holdings, Defendant Weston's personal wealth stood to materially rise and fall with the increases and decreases of the Company's stock price throughout the Class Period.

24.    Defendant Todd Vogensen was Party City's CFO at all relevant times. Defendant

---

[5] *See* Party City Holdco Inc. Proxy Statement dated April 26, 2022, *available at* https://s2.q4cdn. com/832897007/files/doc_financials/2020/ar/b8b92ac0-8189-4578-a455-be279725cbe5.pdf.

[6] *Id*.

Vogensen signed the Q3 2022 10-Q. He also signed a "Certification . . . Pursuant to . . . the Sarbanes-Oxley Act" attached to the Q3 2022 10-Q which stated that the Q3 2022 10-Q did not contain any material misrepresentations or omissions, and that Defendant Vogensen was responsible for maintaining the Company's internal control over financial reporting.

25.    Defendant Vogensen earned a base salary of $650,000 and incentive-based cash bonus of $599,206 in fiscal 2021, the most recent year for which compensation data is publicly available.[7] Defendant Vogensen also held 199,831 shares of the Company's common stock on April 11, 2022, the most recent date for which his aggregate holdings are publicly available.[8] Those shares were valued at $699,409 on that date based on the NYSE closing price of $3.50 per share on April 11, 2022. In light of his significant stock holdings, Defendant Weston's personal wealth stood to materially rise and fall with the increases or decreases of the Company's stock price throughout the Class Period.

26.    Because of their positions within the Company, Defendants Weston and Vogensen possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other public disclosures to investors. Both of the Defendants prepared, oversaw the preparation of, and approved the Company's SEC filings and other relevant financial disclosures throughout the Class Period. Both of the Defendants were responsible for the false statements and omissions in the Q3 2022 10-Q.

**C.    Relevant Non-Party**

27.    Party City is incorporated in Delaware. Its principal executive office is located in Woodcliff Lake, NJ.

---

[7] *Id.*

[8] *Id.*

28.     Party City is not named as a defendant herein due to its pending bankruptcy

proceeding and the resulting stay of litigation under federal bankruptcy law. Plaintiff reserves the

right to name Party City as a defendant going forward, pending the results of its bankruptcy

proceedings or otherwise.

29.     Party City's common stock traded on the New York Stock Exchange (NYSE)

under the symbol "PRTY" from the beginning of the Class Period to approximately January 18,

2023. Party City's common stock then traded in the Over the Counter (OTC) Bulletin Board

market under the symbol "PRTYQ" from approximately January 18, 2023 to the present. The

Company's stock was delisted from the NYSE as a result of the bankruptcy filing, as disclosed in

a Form 8-K the Company filed with the SEC on January 20, 2023.

## SUBSTANTIVE ALLEGATIONS

**A.     False and Misleading Statements and Omissions During the Class Period**

**1.     Misstatements in the Q3 2022 Form 10-Q**

30.     The Class Period begins on November 8, 2022, when the Company filed its Q3

2022 10-Q containing financial results for the quarter ended September 30, 2022. The Q3 2022

10-Q contained positive statements about the Company's liquidity position, capital resources,

and borrowing capacity, stating as follows:

Liquidity and Capital Resources

We have proactively managed our liquidity profile throughout the quarter and
expect to continue to do so going forward. We expect to rely on cash on hand,
cash generated by operations, and borrowings available under our credit
agreements to meet our working capital needs and [they] will be our principal
sources of liquidity. Based on our current level of operations, additional
borrowings, and ongoing efforts to manage and enhance our liquidity profile, **we
believe that these sources will be adequate to meet our liquidity needs for at
least the next 12 months**. . . .

10

Sources of Cash

Based on our current operations and planned strategic initiatives . . . , **we expect to satisfy our short-term and long-term cash requirements through a combination of our existing cash and cash equivalents position, funds generated from operating activities, and the borrowing capacity available under our credit agreements**. . . .

As of September 30, 2022, the Company had cash and cash equivalents of $29.8 million and available borrowings of $91.7 million.

. . . .

Cash Flow Data

. . . .

**As of the end of the third quarter 2022, the Company had total liquidity of $121.5 million** consisting of the following: . . . Cash $29,810[,000] . . . ABL Availability [revolving credit facility] $91,728[,000] . . . Total Liquidity $121,538,000."

31.     The Q3 2022 10-Q gave no indication that the Company was facing a liquidity shortfall, that its borrowing capacity was insufficient to satisfy its cash needs, and that it was unable to locate lenders willing to provide additional loans.

32.     The Balance Sheet contained in the Q3 2022 10-Q indicated that the Company's current assets were approximately equal to its current liabilities, creating an impression that the Company had adequate assets to service its liabilities due in the next twelve months. Specifically, current assets were $941 million and current liabilities were $951 million.

33.     The income statement in the Q3 2022 10-Q indicated that the Company's revenue for the nine months ended September 30, 2022 was approximately equal to its revenue for the nine month period ended September 30, 2021. This created an impression that the Company had stable revenues that would continue to support the Company's liquidity needs in the near future. Indeed, in an earnings release issued contemporaneously with the Q3 2022 10-Q on Form 8-K,

the Company provided an outlook for full-year 2022 financial results, stating that annual

revenues were expected to be just 1% lower than 2021 annual revenues. Neither the Q3 2022 10-

Q nor the earnings release stated or implied that the Company's revenues would be insufficient

to fund the Company's operations in the coming months.

34.    The Q3 2022 10-Q also made false and misleading positive statements about the

Company's internal controls over financial reporting, stating as follows:

> We have carried out an evaluation, under the supervision and with the
> participation of our management, including our Chief Executive Officer and Chief
> Financial Officer, of the effectiveness of the design and operation of our
> disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e)
> under the Securities Exchange Act of 1934, as amended (the "Act")) as of
> September 30, 2022. Based upon that evaluation, **our Chief Executive Officer**
> **and Chief Financial Officer concluded that our disclosure controls and**
> **procedures are effective** in ensuring that information required to be disclosed by
> us in the reports that we file or submit under the Act is: (i) recorded, processed,
> summarized and reported within the time periods specified in the Securities and
> Exchange Commission's rules and forms; and (ii) accumulated and
> communicated to our management, including our principal executive and
> principal financial officers, or persons performing similar functions, as
> appropriate to allow timely decisions regarding required disclosures.
>
> There were no changes in our internal control over financial reporting (as
> defined in Rules 13a-15(f) and 15d-15(f) under the Act) during the three months
> ended September 30, 2022 that have materially affected, or are reasonably likely
> to materially affect, our internal control over financial reporting.

35.    The Q3 2022 10-Q omitted that there was a then-existing material weakness in

internal controls over financial reporting.

### 2.    Misstatements in Sarbanes-Oxley Certifications Signed by Defendants Weston and Vogensen

36.    The Q3 2022 10-Q included Sarbanes-Oxley Certifications signed by Defendants

Weston and Vogensen. Each Certification stated the following, in relevant part:

> Based on my knowledge, **this [Form 10-Q] does not contain any untrue**
> **statement of a material fact or omit to state a material fact necessary to make**
> **the statements made, in light of the circumstances under which such statements**

**were made, not misleading** with respect to the period covered by this report;

Based on my knowledge, **the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant** as of, and for, the periods presented in this report;

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; [and]

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation. . . .

37.    The Q3 2022 10-Q also included a "Certification Pursuant to 18 U.S.C. Section 1350" signed by Defendants Weston and Vogensen. The Certification stated: "I . . . certify . . . that . . . **the information contained in the [Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company**."

38.    Collectively, these Certifications were false and misleading because the Q3 2022 10-Q did in fact contain material misrepresentations and omissions. Among other things, as admitted by the Company, the Q3 2022 10-Q should have included a going concern warning and disclosure of the existence of a material weakness in internal control over financial reporting.

**3.    Misstatements by Defendants Weston and Vogensen in the Q3 2022 Earnings Call**

39.    The Defendants also made misleading statements and omissions in an earnings call with analysts and investors on November 8, 2022, the same day the Q3 2022 10-Q was filed.

40.    During the earnings call, Defendant Vogensen stated:

> Let me now turn to liquidity. **We ended the quarter with $122 million in total liquidity**, comprised of $30 million in cash and **$92 million of revolver availability**.

> At quarter end, we had a principal balance of debt net of cash of $1.67 billion. Our cost [reduction] actions will drive approximately $30 million in annualized savings, **improving our liquidity position** as we navigate what could be a challenging macro environment in 2023. So in summary, we're pleased with our third quarter results.[9]

41.    It was misleading for Defendant Vogensen to state that the Company had "$122 million in total liquidity," that it had "$92 million of revolver availability," and that it was "improving [its] liquidity position," without disclosing the then-known fact that the Company was facing severe liquidity problems, that its existing line of credit availability was inadequate, and that it was unable to locate lenders willing to provide additional loans.

42.    Defendant Vogensen made similar misleading statements in a Q&A with an analyst as follows:

> [Question:] [W]hen we look at liquidity, $122 million . . . at the end of the quarter . . . . [H]ow do you feel about liquidity with the $23 million maturity of those 6 notes in '23 coming up?

> [Answer:] [G]enerally, **as we look at our liquidity, we have a number of levers [ways to obtain additional liquidity] that we continue to pull**. Working capital will be a benefit to us next year as we work through some of our inventory. We continue to have the ability to manage capital and our CapEx [capital expenditures] expense. . . .  And then, you've seen from us in the past and we

---

[9] *See* https://seekingalpha.com/article/4554950-party-city-holdco-inc-prty-q3-2022-earnings-call-transcript.

continue to be open to and **we're actively looking at alternatives for financing.
And so we do have a lot of levers out there, and we continue to manage those
levers proactively**.[10]

43.     It was misleading for Defendant Vogensen to state that the Company had a
"number of levers" by which to obtain additional liquidity, that the Company "continue[s] to
manage those levers proactively," and that it was "actively looking at alternatives for financing,"
without disclosing the then-known fact that the Company was facing severe liquidity problems,
that its existing credit facilities were inadequate, and that it was unable to locate lenders willing
to provide additional loans.

44.     Defendant Weston was on the earnings call and had a prominent speaking role
throughout the call. Despite having a platform to correct Defendant Vogensen's misleading
statements, or at least provide clarifying context, he intentionally or recklessly chose not to do
so. In this regard, he engaged in culpable omissions because he had a duty to speak to correct the
misrepresentations.

**B.     The Truth Begins to Emerge**

45.     The truth about the Company's misrepresentations and omissions began to
emerge through a series of partial corrective disclosures discussed below.

**1.     The Bankruptcy Proceedings Reveal Previously Concealed Shortfalls
in Party City's Liquidity Position and Borrowing Capacity**

46.     On January 6, 2023, *The Wall Street Journal* published a short article stating for
the first time that Party City was contemplating filing bankruptcy. The article stated in relevant
part: "Party City Holdco Inc. is preparing to file for bankruptcy within weeks, according to
people familiar with the matter, after the party-favor retailer's cash dwindled and inflation
dampened sales." Few additional details were provided.

---

[10] *Id.*

47.    On this news, the price of the Company's stock **declined by 50%** from a closing price of $0.358 on January 5, 2023 to a closing price of $0.179 on January 6, 2023, representing a decline of $0.179.

48.    Nine days later, on January 17, 2023, the Company filed for bankruptcy pursuant to Chapter 11 of the U.S. Bankruptcy Code.

49.    Filings in the bankruptcy proceeding indicated that the need for bankruptcy protection stemmed from the Company's liquidity shortfalls and inadequate access to badly needed additional loans. For example, Party City filed an initial motion stating:

> To continue operating in the ordinary course, and to effectuate an efficient and expeditious restructuring, the Debtors need immediate access to liquidity. . . . [T]he Debtors, with the assistance of their advisors, analyzed their cash needs in order to determine the liquidity levels necessary to stabilize the Debtors' operations . . . . In undertaking this analysis, the Debtors and their advisors considered the Debtors' near-term projected financial performance, including demand for the Debtors' products and the cost of supplying such products, along with their current liquidity position.[11]

50.    An accompanying Declaration (the previously defined Keil Declaration) stated that Party City had been unable to obtain sufficient additional loans in the normal course of business to satisfy its liquidity needs. Therefore, the Company needed to obtain emergency financing via a bankruptcy restructuring in which specialized lenders would issue high-cost loans collateralized by assets that already served as collateral for the Company's existing loans. The Declaration stated in relevant part:

> Over the past several months, including well in advance of the Debtors' decision to pursue a holistic balance sheet restructuring [via bankruptcy], the Debtors, with the assistance of Moelis, have made significant efforts to secure financing and capital needed to address the Debtors' liquidity challenges and evaluated a broad range of capital structure alternatives.

---

[11] Debtor's Emergency Motion for Entry of Interim and Final Orders at ¶ 20, Jan. 18, 2023, Bankr. Dkt. No. 10, *available at* https://cases.ra.kroll.com/PCHI/Home-DownloadPDF?id1=MjMzOTM2NQ==&id2=-1.

During 2022, Moelis evaluated the Debtors' liquidity needs and long-term capital structure while conducting outreach to identify potential providers of additional capital. . . . Moelis spoke with over 20 potential investors since October 2022 about . . . out-of-court financing alternatives . . . .

Despite the potential for certain alternatives to provide the Debtors with liquidity, the prospects for the Debtors even after receiving any potential additional capital remained challenged. The quantum of capital that parties were prepared to provide was insufficient in light of the Debtors' long-term capital needs, highly levered capital structure, and short-term liquidity needs. . . .

Once the Debtors made the decision to pivot towards an in-court balance sheet restructuring in November 2022 Moelis and the Debtors engaged with potentially interested parties in efforts to secure post-petition financing.

. . . .

The Debtors negotiated the DIP [Debtor-in-Possession] Facility with the Ad Hoc Noteholder Group in conjunction with the negotiation of the Restructuring Support Agreement. Entry into the DIP Facility . . . provides the Debtors a pathway to a prompt exit from chapter 11 with the consent of the majority of their secured lenders.[12]

51.    A separate Declaration (the previously defined Orlofsky Declaration) provided

details of the amount and cost of the DIP Facility, stating in relevant part:

Pursuant to a restructuring support agreement . . . (the "Restructuring Support Agreement"), the [lenders] of more than 70% of the principal amount outstanding under the [Company's pre-existing] First Lien Notes have agreed . . . to support the restructuring, including to vote in favor of the Debtors' chapter 11 plan . . . . The Restructuring Support Agreement is anchored by a $150 million debtor in possession financing facility (the "DIP Facility"), which is fully backstopped by the members of the Ad Hoc Noteholder Group. The DIP Facility will provide critically needed liquidity to support the Debtors' continued operations . . . .

. . . .

Amounts outstanding under the DIP Facility will bear interest at the Secured Overnight Financing Rate plus 10%. The DIP Facility also provides for

---

[12] Keil Decl. ¶¶ 12-15, 26, 12, *supra*.

certain fees, including an upfront commitment premium of 8% . . . .[13]

52.     Importantly, the bankruptcy filings reveal that Party City and therefore Defendants were well aware of its liquidity problems and credit facility shortfall for several months, dating back to *before* it filed its Q3 2022 10-Q. For example, the Keil Declaration stated:

> Moelis has been engaged by the Debtors to provide financial advisory and investment banking advice **since early 2020** and has worked with the Debtors to identify potential solutions to address financial challenges facing the business, including its highly leveraged capital structure, sizeable debt servicing obligations including significant interest payments and near-term maturities, and ongoing liquidity tightness driven in part by the Debtors' capital structure, continuing operational challenges and macroeconomic factors.
>
> . . . .
>
> Recent efforts to address the Debtors' capital structure and identify attractive sources of incremental liquidity have been challenged due to inflation, macroeconomic headwinds, the bull-whip effect from supply chain difficulties, global helium supply challenges and the numerous other challenges facing many retailers today. These challenges led to the Debtors materially underperforming expectations **since early 2022**.
>
> As these financial challenges persisted through the **third** . . . **quarter[] of 2022**, . . . **it became apparent that refinancing and capital raising transactions would not adequately address the Debtors' capital structure challenges** . . . .
>
> . . . .
>
> Over the **past several months**, including **well in advance of the Debtors' decision to pursue a holistic balance sheet restructuring [in bankruptcy]**, the Debtors . . . have made significant efforts to secure financing and capital needed to address the Debtors' liquidity challenges . . . .[14]

53.     The Orlofsky Declaration corroborated management's knowledge of liquidity problems prior to issuance of the Q3 2022 10-Q, stating the following in relevant part:

---

[13] Orlofsky Decl. at ¶¶ 10, 68, *supra*.

[14] Keil Decl. ¶¶ 7-9, 12, *supra*.

By the **fall of 2022**, management determined that, notwithstanding its ongoing cost-cutting and other efforts to improve liquidity, **further steps needed to be taken to allow the Debtors to successfully weather the ongoing downturn and avoid eventual default**. In **August 2022**, the Debtors retained Paul, Weiss, Rifkind, Wharton & Garrison, LLP, as legal advisor, and, in **October 2022 and November 2022**, re-engaged AlixPartners and Moelis & Company LLC, as financial advisor and investment banker, respectively (each of whom had been involved in the Debtors' prior strategic transactions) to explore restructuring alternatives. Together, the Debtors and their advisors analyzed the Debtors' capital structure, potential sources of liquidity, and runway to right-size their balance sheets and address their debt load.[15]

54.    Despite management's knowledge of severe liquidity problems and inadequate access to badly needed new loans as of September 30, 2022, the Company did not disclose that adverse information in its Q3 2022 10-Q or any subsequent public disclosures leading up to its bankruptcy. As a result, Class Members continued to purchase Party City stock after issuance of the Q3 2022 10-Q without any knowledge of the adverse facts bearing on the Company's liquidity and inadequate borrowing capacity.

55.    The bankruptcy filings also indicate that Party City intentionally delayed public disclosure of its liquidity problems for as long as possible due in large part to the Company's concerns about how its vendors and other stakeholders would react to the negative news. Specifically, the Keil Declaration stated that the "**Debtors [had] concerns regarding a potential premature and uncoordinated disclosure of [the need for] a chapter 11 filing that the Debtors believed could have triggered a crisis in vendor confidence, resulting in a significant tightening of trade terms** . . . ."[16] Similarly, the Orlofsky Declaration stated:

> In my experience, retail businesses like the Debtors' require strong relationships with their stakeholders. When vendors lose confidence in retailers, they reduce their trade terms; when employees lose confidence, they pursue other

---

[15] Orlofsky Decl. ¶ 61, *supra*.

[16] Keil Decl. ¶ 19, *supra*.

opportunities. When retailers curtail trade terms or employees quit, other stakeholders lose confidence, leading to a vicious cycle that is difficult, if not impossible, to escape. In fact, I believe that **a mere perception among the Debtors' stakeholders . . . [of] any serious doubt that the Debtors are sufficiently capitalized and liquid to continue as a going concern, could result in the vicious cycle discussed above**.[17]

56.     Essentially, Party City intentionally concealed its liquidity problems from the public because it feared that the adverse information might cause its vendors to impose more restrictive sales terms or cause its employees to seek employment elsewhere. Such motivations, however justified from a business perspective, are no basis upon which to engaging in securities fraud.

57.     The bankruptcy petition, filed on January 17, 2023, appears to have been filed at the end of the trading day. Party City issued a press release the following day, January 18, 2023, announcing the bankruptcy. When news of the bankruptcy permeated the market, the price of the Company's stock **declined by 67%** over a two-day span from a closing price of $0.374 on January 17, 2023 to a closing price of $0.121 on January 19, 2023, representing a decline of $0.253.

    **2.**    **Party City's Announcement of a "Going Concern" Disclosure Failure, Material Weakness in Internal Control, and E&Y's Resignation**

58.     On June 9, 2023, the last day of the Class Period, Party City filed a Form 8-K with the SEC admitting that: (i) the Q3 2022 10-Q should have included a "going concern" warning; (ii) there was a material weakness in internal control over financial reporting as of the date the Q3 2022 10-Q was filed; and (iii) E&Y resigned as the Company's audit firm due to a disagreement with Party City management about the Company's treatment of the going concern issue. The Form 8-K noted that the Q3 2022 10-Q contained a "material error," that it "should no

---

[17] Orlofsky Decl. ¶ 61, *supra*.

longer be relied on," and that it "should be restated." The Form 8-K stated in relevant part:

> On June 5, 2023, the Audit Committee . . . of Party City Holdco Inc. (the "Company") received a letter from Ernst & Young LLP ("EY") stating that EY had resigned as the Company's independent registered accounting firm for the year ended December 31, 2022.

> . . . .

> In its resignation letter, EY noted (i) that the Company and users of its financial statements should not rely on EY's previously completed interim review for the quarter and nine months ended September 30, 2022, because **EY concluded that the Company ought to have disclosed in the financial statements in the Company's quarterly report on Form 10-Q for the period ended September 30, 2022 (the "Third Quarter Form 10-Q") that there was substantial doubt regarding the Company's ability to continue as a going concern within one year, resulting in a material error in such financial statements** and (ii) that EY took exception to the Company's "apparent" refusal to consider whether the financial statements in the Third Quarter Form 10-Q were materially misstated and, if so, to make an appropriate [subsequent] disclosure under Item 4.02(a) of Form 8-K [to inform investors of the misstatements].

> . . . .

> In connection with the Company's assessment of the effectiveness of internal control over financial reporting as of December 31, 2022, the associated audit being conducted by EY, and an investigation under the supervision of the Company's Audit Committee, **the Company identified a material weakness in internal control over financial reporting relating to management's analysis under ASC Subtopic 205-40 *Presentation of Financial Statements-Going Concern* as of November 8, 2022, the date the Company filed the Third Quarter Form 10-Q**. Under ASC 205-40, the Company has the responsibility to evaluate whether conditions and/or events raise substantial doubt about its ability to meet its obligations as they become due within one year after the date that the financial statements are issued. In re-performing this evaluation as of the date of the filing of the Third Quarter Form 10-Q, **the Company concluded that there was substantial doubt about the Company's ability to continue as a going concern**.

> As a result of the Company's failure to disclose in the Third Quarter Form 10-Q that there was substantial doubt about the Company's ability to continue as a going concern, on June 6, 2023, the Audit Committee concluded, after discussion with the Company's management and EY, that the interim unaudited **financial statements included within the Third Quarter Form 10-Q should no longer be relied upon**. The Audit Committee further determined that the **Third Quarter Form 10-Q should be restated**.

59.    The Form 8-K included a copy of a letter E&Y sent to the SEC dated June 9, 2023, which stated in relevant part:

> [T]he material weakness was identified following an internal investigation initiated after **EY raised concerns to the Company regarding the accuracy and timeliness of information provided by the Company to EY, including information relevant to the Company's analysis of whether there were conditions or events giving rise to substantial doubt about the Company's ability to continue as a going concern** within one year after its issuance of its financial statements as of and for the period ending September 30, 2022. **The . . . Company inform[ed] EY on multiple occasions that it did not believe it was necessary to evaluate whether its financial statements for the quarter and nine months ending September 30, 2022 were materially misstated, and did not provide support for that view in response to multiple requests from EY. The . . . Company did not respond to multiple requests by EY for further information regarding, and support for, the Company's decision not to evaluate the matters referenced above**. Given this, we disagree with the [Company's] characterization of EY's resignation as "abrupt."

60.    Thus, E&Y's letter to the SEC stated that the Company's management provided inaccurate and untimely information to E&Y in connection with E&Y's review of the going concern issue. It also stated that the Company's management repeatedly failed to provide relevant information requested by E&Y. These actions by management reflected intentional or reckless conduct, not mere negligence or an innocent oversight.

61.    Party City filed the Form 8-K at the end of the trading day on June 9, 2023, which was a Friday. As the market absorbed the information, the price of the Company's stock **declined by 22%** over the next three trading days from a closing price of $0.046 on June 9, 2023 to $0.036 on June 14, 2023, representing a decline of $0.01.

62.    Prior to the filing of the Form 8-K, Class Members were unaware that there was a substantial doubt about the Company's ability to continue as a going concern. Even when the Company filed bankruptcy, its filings cast the liquidity issues as matters that would be resolved by additional financing to be obtained in the bankruptcy proceedings. For example, in a Form 8-

K filed on January 18, 2023, the Company stated: "[Party City] has secured a commitment . . . for $150 million in debtor-in-possession financing. . . . [T]his 'new money' financing will provide ample liquidity to support continued operations . . . ." The bankruptcy is a Chapter 11 restructuring rather than Chapter 7 liquidation, meaning the Company will remain operational as a result of the restructuring. Thus, the going concern revelation in the Form 8-K was important additional news that shed light on the extent of the Company's liquidity problems and credit facility shortfalls as of September 30, 2022.

63.    Class Members were also unaware, prior to the filing of the June 9, 2023 Form 8-K, that there was a material weakness in the Company's internal control as of September 30, 2022, and that the Q3 2022 10-Q should no longer be relied on. Accordingly, even Class Members who purchased Party City stock *after* the bankruptcy date continued to be deceived by the false statements and omissions in the Q3 2022 10-Q, which investors continued to rely on. The Q3 2022 10-Q was the most recent quarterly or annual SEC filing from the date of its issuance to the date the June 9, 2023 Form 8-K was filed seven months later.

64.    In sum, throughout the Class Period, the Defendants made or caused to be made materially false and misleading statements and omissions concerning the Company's financial strength. Specifically, in the Q3 2022 10-Q, the Company: (i) affirmatively misrepresented that its capital resources "will be adequate to meet our liquidity needs for at least the next 12 months"; (ii) omitted that there was substantial doubt about the Company's ability to continue as a going concern; (iii) downplayed the nature and extent of the Company's then-existing liquidity problems; (iv) omitted that the Company's existing credit facilities were insufficient to satisfy its operational needs and that it was unable to obtain additional loans in the normal course of business; and (v) omitted that there was a material weakness in its internal control over financial

23

reporting.

**C.    GAAP Standards Governing Going Concern Issues Required Party City to Analyze the Exact Information It Ignored**

65.    Generally Accepted Accounting Standards ("GAAP") governing the going concern analysis are set forth at Accounting Standards Codification ("ASC") Section 205-40, titled *Presentation of Financial Statements – Going Concern*.

66.    Under ASC 205-40-20, "Substantial doubt about an entity's ability to continue as a going concern exists when conditions and events, considered in the aggregate, indicate that it is probable that the entity will be unable to meet its obligations as they become due within one year after the date that the financial statements are issued." Here, as discussed above, the Company was well aware of its liquidity problems and shortfalls in borrowing ability at the time the Q3 2022 10-Q was filed. Further, the Company filed bankruptcy just 70 days thereafter. No unforeseen intervening events arose between the date of the Q3 2022 10-Q and date of bankruptcy that unexpectedly triggered the need for bankruptcy. Rather, all facts indicating a going concern problem existed when the Q3 2022 10-Q was filed.

67.    Under GAAP, the Company had a duty to specifically analyze its "liquidity sources" and "access to credit" when conducting its going concern analysis. Specifically, ASC 205-40-50-5 states:

> When evaluating an entity's ability to meet its obligations, management shall consider quantitative and qualitative information about the following conditions and events, among other relevant conditions and events known and reasonably knowable at the date that the financial statements are issued:
>
> > a) The entity's current financial condition, including its **liquidity sources** at the date that the financial statements are issued (for example, available liquid funds and **available access to credit**) . . . .

68.    Similarly, ASC 205-40-55-2 states that management must also consider "working

24

capital deficiencies, negative cash flows from operating activities, . . . and a **need to seek new sources or methods of financing**" when conducing the going concern analysis. At the time the Q3 2022 10-Q was filed, the Company and its senior executives, including Defendants, knew it needed to seek new sources of financing because its existing lenders would not lend it more money. This was set forth in the bankruptcy Declarations discussed above.

69.     Defendants had a clear duty under GAAP to analyze its liquidity problems and lending shortfalls at the time it issued the Q3 2022 10-Q. Defendants cannot credibly argue that they were unaware of the liquidity problems or lending shortfalls, or that those matters were irrelevant or immaterial to the going concern analysis. Given the clarity of the GAAP obligations and facts indicating then-existing known liquidity problems, Defendants' conduct was intentional or reckless in failing to include a going concern warning in the Q3 2022 10-Q.

**D.    Scienter**

70.     Both of the Defendants engaged in intentional or reckless conduct in preparing, issuing, and/or approving the issuance of the misleading statements and omissions alleged herein.

71.     Defendant Weston was the Company's CEO. In that role, he assumed primary responsibility for the accuracy of the Q3 2022 10-Q. He signed a Certification stating that the Q3 2022 10-Q did not contain any material untrue statements or omissions. The Certification acknowledged that he is "responsible for establishing and maintaining disclosure controls and . . . internal control over financial reporting." He was not a mere bystander to the misleading statements and omissions. He was a central participant.

72.     Similarly, Defendant Vogensen was the Company's CFO. In that role, he too assumed primary responsibility for the accuracy of the Q3 2022 10-Q. He signed a Certification

stating that the Q3 2022 10-Q did not contain any material untrue statements or omissions. The Certification acknowledged that he is "responsible for establishing and maintaining disclosure controls and . . . internal control over financial reporting." He was not a mere bystander to the misleading statements and omissions. He was a central participant.

73.    E&Y's letter to the SEC implicated the Company, stating that the Company provided inaccurate and untimely information to E&Y in connection with E&Y's analysis of the need for a going concern warning in the Q3 2022 10-Q. Specifically, E&Y's letter cited problems with the "accuracy and timeliness of information provided by the Company to EY," and noted that the Company "did not respond to multiple requests by EY for further information." Defendants, either directly or as controlling persons, are responsible for the Company's conduct in sending inaccurate and untimely information to E&Y and withholding other critical information.

74.    As a result of the severity of the going concern issue and issues raised in E&Y's letter to the SEC, the SEC initiated a formal investigation.[18]

75.    As noted in the bankruptcy Declarations, the Company intentionally delayed publicly disclosing its liquidity problems to avoid triggering a crisis in confidence of vendors and other stakeholders. Defendants, as the key decision makers regarding liquidity disclosures to investors, were responsible for those intentional omissions.

76.    Defendant Vogensen made misleading statements and omissions in the November

---

[18] *See* Supplement to Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Reorganization of Party City Holdco Inc. and its Debtor Affiliates, July 21, 2023, *available at* https://fintel.io/doc/sec-party-city-holdco-inc-1592058-ex992-2023-july-24-19562-5736 ("On July 12, 2023, [Party City] received a letter from the United States Securities and Exchange Commission requesting that [Party City] preserve and retain certain documents and data relevant to an ongoing investigation.").

8, 2022 earnings call with analysts and investors. He did so while holding contemporaneous knowledge that the Company was facing severe liquidity problems, that its existing credit lines were inadequate, and that it was unable to locate lenders willing to provide additional loans. Defendant Weston failed to correct Defendant Vogensen's misleading statements on the call.

77.     The misleading statements and omissions involved matters that were central to the Company's operations, not tangential or of minimal significance. The liquidity and lending issues were so critical to the Company that they threatened the Company's ability to remain operational, and ultimately led to the need to file bankruptcy. This too supports an inference of scienter.

78.     The Company has admitted that the Q3 2022 10-Q improperly omitted a going concern warning, that the financial statements therein should "no longer be relied upon," and that the Q3 2022 10-Q needs to be "restated." These admissions, in combination with the other evidence herein, support an inference that the Defendants, who had primary responsibility over the Q3 2022 10-Q, acted with intent or recklessness in disseminating the misleading statements.

79.     Both of the Defendants had a motive and opportunity to disseminate misleading statements to investors. With respect to motive, both Defendants held a large number of shares of Party City common stock. Defendant Weston held 1,065,164 shares, valued at $3.7 million. Defendant Vogensen held 199,831 shares, valued at $699,409. In light of those holdings, the Defendants' personal wealth stood to rise and fall in direct tandem with increases and decreases in the Company's stock price. This provided a motive to issue misleading statements about the Company's financial position, in order to strengthen the stock price.

80.     With respect to opportunity, both Defendants were responsible for preparing, overseeing the preparation of, and/or approving the Q3 2022 10-Q. Both Defendants had access

to relevant nonpublic information bearing on the Company's liquidity and borrowing ability, as well as the going concern analysis and internal control issues central to this case.

81.    Scienter may be satisfied circumstantially based on the totality of the circumstances alleged in the Complaint. Factual allegations bearing on scienter must be viewed in aggregate, not in isolation on an item-by-item basis. Reasonable inferences must be drawn from the facts alleged.

82.    Here, given the Defendants' central role in the matters at issue in this case, the fact that both Defendants were aware of the Company's liquidity problems, credit facility shortfalls, and inability to locate lenders willing to provide additional loans at the time the Q3 2022 10-Q was filed, the fact that the Company admitted that the Q3 2022 10-Q contained material omissions and should no longer be relied on, the fact that E&Y implicated the Company for wrongdoing, the fact that the Defendants were responsible for overseeing the internal controls that contained a material weakness, and all other facts alleged herein, Plaintiff is entitled to the reasonable inference at the pleading stage that both of the Defendants acted with scienter.

**E.    Loss Causation**

83.    As a direct result of Defendants' wrongful conduct, the price of Party City's stock was artificially inflated throughout the Class Period.

84.    Plaintiff and Class Members unknowingly and in reliance upon the integrity of the market purchased Party City stock at artificially inflated prices. But for Defendants' wrongful conduct, Plaintiff and Class Members would not have purchased Party City stock, or would not have paid the prices they paid for the stock.

85.    The truth regarding the misrepresentations and omissions was revealed in a series of corrective disclosures that occurred between January 6, 2023 (the date of the *Wall Street*

28

*Journal* article forecasting the Company's bankruptcy) and June 9, 2023 (the date the Form 8-K was filed revealing the going concern omission and E&Y's resignation).

86.    During this corrective disclosure period, the Company's stock price fell precipitously as the artificial inflation was removed. The declines in the Company's stock price were attributable to the market absorbing information that corrected the misrepresentations and omissions.

87.    Plaintiff and the Class suffered economic losses when the price of the Company's stock fell in response to the corrective disclosures.

88.    Defendants' wrongful conduct directly and proximately caused the artificial inflation in the stock price and the damages suffered by Plaintiff and the Class.

89.    It was foreseeable that the misrepresentations and omissions would lead to artificial inflation in the value of the Company's stock. It was also foreseeable that corrective disclosures revealing the truth about the misrepresentations would cause the stock price to decline.

90.    The following corrective disclosures are disclosures that either partially corrected the misrepresentations or reflected a "materialization of risk" masked by the misrepresentations. These corrective disclosures are representative examples only, not necessarily an exclusive list of all disclosures correcting the misrepresentations and/or reflecting a materialization of risk. Plaintiff reserves the right to revise these corrective disclosures with the benefit of discovery and expert testimony.

91.    On January 6, 2023, the *Wall Street Journal* published an article forecasting the Company's bankruptcy. The article partially corrected the misrepresentations and omissions regarding the Company's liquidity problems and shortfalls in borrowing capacity. On this news,

the price of the Company's stock declined by 50% in one day, discussed more fully above.

92.    On January 17, 2023, the Company filed for bankruptcy. The information in the bankruptcy filings partially corrected the misrepresentations and omissions regarding the Company's liquidity problems and shortfalls in borrowing capacity. As the market absorbed this information, the price of the Company's stock declined by 68% over a two-day span, discussed more fully above.

93.    On June 9, 2023, the Company filed its Form 8-K revealing the going concern omission, the existence of a material weakness in internal control, and E&Y's resignation. The information in the Form 8-K partially corrected the misrepresentations and omissions regarding both the going concern issue and the status of the Company's internal controls. On this news, the price of the Company's stock declined by 22% in three trading days, discussed more fully above.

94.    In addition to corrective disclosures, loss causation is also established in this case by the materialization of risk theory. The Q3 2022 10-Q concealed that the Company was facing severe liquidity problems and had a shortfall in its borrowing ability. The misrepresentations and omissions concealed the underlying risk of a liquidity crisis. The risk of a liquidity crisis ultimately materialized when the Company could no longer fund its operations and needed to file bankruptcy. Bankruptcy represented a materialization of previously concealed risk, satisfying loss causation.

## CLASS ACTION ALLEGATIONS

95.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities that purchased or otherwise acquired Party City securities between November 8, 2022 and June 9, 2023, inclusive, and who were damaged thereby (the "Class" or "Class Members").

96.    Excluded from the Class are Defendants and members of their immediate families, all other officers and directors of Party City during the Class Period, and any entity in which Party City holds a controlling interest.

97.    Numerosity: Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE and via the OTC market. While the exact number of Class Members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are at least thousands of members of the Class. Beneficial and record owners of the stock may be identified from records maintained by Party City or its transfer agent, and those owners may be notified of the pendency of this action by mail or other commonly used means using a form of notice similar to that customarily used in securities class actions.

98.    Commonality: Fed. R. Civ. P. 23(a)(2). There are many questions of "law or fact" common to the Class for purposes of Rule 23(a)(2), including but not limited to:

a.    whether the 3Q 2022 10-Q contained false statements and omissions;

b.    whether those false statements and omissions were material;

c.    whether each of the Defendants had a role in preparing, approving, or disseminating the false statements and omissions;

d.    whether each of the Defendants acted with scienter; and

e.    whether the false statements and omissions caused legally cognizable damages, and if so, what class-wide model should be used to measure those damages.

99.    Typicality: Fed. R. Civ. P. 23(a)(3). Typicality is satisfied here because the claims of Plaintiff and all other Class Members are derived from the same operative facts. All Class

Members were deceived by the same underlying misrepresentations and omissions, which were incorporated into the price of the Company's stock. Plaintiff and Class Members have the same basic legal claims against Defendants.

100.    <u>Adequacy of Representation: Fed R. Civ. P. 23(a)(4)</u>. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who are highly experienced in securities class action litigation. Plaintiff's counsel have the financial and personnel resources to litigate this matter through all phases of pretrial litigation, trial, and any necessary appeals. Neither Plaintiff nor its counsel have any interests that are contrary to or in conflict with those of the Class.

101.    <u>Predominance: Fed. R. Civ. P. 23(b)(3)</u>. Defendants engaged in a common course of conduct directed toward all Class Members equally. The common issues identified above predominate over any issues affecting only individual Class Members. The common issues hinge upon Defendants' conduct rather than the conduct of any individual Class Member. Adjudication of the common issues in a single action has important and desirable advantages that will lead to judicial economy.

102.    <u>Superiority: Fed. R. Civ. P. 23(b)(3)</u>. A class action is superior to all other available methods for the fair and efficient adjudication of this matter. Class treatment of common questions of law or fact is superior to multiple individual actions or piecemeal litigation. The litigation of separate actions by investors would also create a risk of inconsistent or varying adjudications, which could establish incompatible standards of conduct for Defendants. In contrast, conducting this action on a class-wide basis presents fewer management difficulties, conserves judicial and party resources, and pursues the rights of all Class Members in a single proceeding. Absent a class action, the vast majority of Class Members would find that

the cost of litigating their individual claim is prohibitively high and they would therefore have no realistic means to a remedy on an individual basis.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE

103.    The market for Party City's securities was open, well-developed, and efficient at all relevant times. As a result of the misleading statements and omissions alleged herein, the Company's securities traded at artificially inflated prices throughout the Class Period.

104.    Plaintiff and the Class Members purchased or otherwise acquired Party City securities relying upon the integrity of the market price of the securities. The market price was reflective of all material publicly available information about the Company disseminated in the Company's SEC filings and by other means.

105.    The market for the Company's securities was an efficient market for the following reasons, among others:

a.    Party City common stock met the requirements for listing on a public stock exchange, and were listed and actively traded on the NYSE, a highly efficient and automated market. Even after the Company's stock was delisted from the NYSE due to the Company's bankruptcy, the stock continued to be actively traded on the OTC market. The OTC market is a well-developed market where daily pricing information and aggregate trading volumes for the Company's stock are readily available on a variety of financial websites.

b.    As a registered and regulated issuer of publicly held securities, Party City filed periodic public reports with the SEC.

c.    Party City regularly communicated with investors through established market communication mechanisms, including via disseminations of press releases on the

33

national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and securities analysts.

d.      Party City was followed by numerous securities analysts employed by brokerage firms that wrote and disseminated reports about the Company. The analysts were from Bank of America Merrill Lynch, Barclays, Jefferies, and JPMorgan Chase, among others. Many of the analysts' reports were distributed to the brokerage firms' sales forces and certain customers of the respective firms. Many of the reports also entered the public marketplace.

106.    As a result of the foregoing, the market for Party City's securities promptly digested current information about the Company from all publicly available sources. The market price of the Company's securities reflected all material publicly available information.

107.    Due to the misleading statements and omissions alleged herein, Party City's stock traded at artificially inflated prices throughout the Class Period.

108.    Plaintiff and other Class Members purchased or otherwise acquired Party City stock relying upon the integrity of the market price of the shares as reflecting all material publicly available information about the Company.

109.    Plaintiff and other Class Members, as purchasers of Party City stock that traded at artificially inflated prices, are entitled to a presumption of reliance on the misrepresentations and omissions under the fraud-on-the-market doctrine.

110.    A Class-wide presumption of reliance is also available under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) because the Plaintiff's claims are grounded in large part on omissions. This action involves omission of a going concern warning, a material weakness in internal control, and adverse facts about the

Company's liquidity problems. Therefore, proof of actual reliance on an affirmative false statement is not a prerequisite to recovery. All that is necessary is that the omitted facts were material in the sense that a reasonable investor might have considered them important in making an investment decision. Given the importance of the omitted information alleged herein, that requirement is satisfied here.

## <u>NO SAFE HARBOR</u>

111.    The statutory safe harbor provided for forward-looking statements under certain limited circumstances does not apply to any of the misleading statements and omissions pleaded herein.

112.    The statements alleged to be false or misleading all relate to then-existing facts and conditions.

113.    To the extent that certain of the misleading statements alleged herein may be characterized as forward looking, they were not expressly identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements.

114.    To the extent that the statutory safe harbor is determined to apply to any false statements pleaded herein, Defendants are nevertheless liable for those false statements because at the time each statement was made, the speaker had actual knowledge that the statement was false or misleading.

## COUNT I

### Violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 Thereunder (17 C.F.R. § 240.10b-5)

115.    Plaintiff repeats and re-alleges each allegation above as if fully set forth herein.

116.    Throughout the Class Period, Defendants engaged in a course of conduct by which they intentionally or recklessly: (i) issued or approved the issuance of the false and misleading statements set forth above; (ii) deceived the investing public, including Plaintiff and the Class, in the manner set forth above; and (ii) caused Plaintiff and the Class to purchase Party City securities at artificially inflated prices and incur resulting damages.

117.    Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon Class members in an effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

118.    Each Defendant is sued as both a primary participant in the wrongful conduct alleged herein, and as a controlling person as pled in Count II below.

119.    The Defendants, individually and in concert with each other, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, participated in a course of conduct to issue misleading information or conceal adverse information regarding the Company's financial condition.

120.    Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information.

121.    Each Defendant's primary liability and controlling person liability arises from the following facts, among others: (i) the Defendants were high-level executives at the Company

throughout the Class Period and were members of the Company's management team; (ii) each Defendant, by virtue of their responsibilities and activities as senior officers of the Company, was privy to and participated in the creation, approval, and reporting of the Company's financial statements and SEC filings; (iii) each Defendant had access to and oversaw other members of the Company's management team and financial reporting team; (iv) each Defendant had unfettered access to financial and other information about the Company's finances, operations, and liquidity at all relevant times; (v) each Defendant signed Sarbanes-Oxley Certifications attesting to the accuracy of the Company's financial statements; and (vii) each Defendant was responsible for overseeing internal control over financial reporting.

122.    Defendants had actual knowledge of the misrepresentations and omissions set forth herein, or acted with reckless disregard for the truth of the matters disclosed.

123.    Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's true financial position.

124.    As a result of the misleading statements and omissions, the market value of the Company's securities was artificially inflated throughout the Class Period.

125.    In ignorance of the fact that the market value of the Company's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the securities traded, Plaintiff and other Class Members acquired the Company's securities during the Class Period at artificially inflated prices, and suffered legally cognizable damages as a result.

126.    Had Plaintiff and other Class Members known the truth regarding the Company's misleading statements and omissions, they would not have purchased the Company's securities, or would have only been willing to purchased them at lower prices.

127.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the Exchange Act (15 U.S.C. § 78t)

128.    Plaintiff repeats and re-alleges each allegation above as if fully set forth herein.

129.    Each Defendant acted as a controlling person of Party City within the meaning of Section 20(a) of the Exchange Act (15 U.S.C. § 78t). By virtue of their high-level positions, oversight of and/or awareness of the Company's financial operations, supervisory duties regarding financial matters, and intimate knowledge of financial information filed with the SEC, the Defendants had the power to influence and control, directly or indirectly, the decision making of the Company, including with respect to the content of the misleading statements and omissions alleged herein.

130.    Each Defendant was provided with, or had unlimited access to, copies of the Company's financial reports, financial information, draft SEC filings, and other information disseminated to investors, including all information alleged herein to be misleading.

131.    Each Defendant had the ability to prevent the issuance of the misleading statements, or cause the statements to be corrected prior to their public dissemination.

132.    Each Defendant had direct and supervisory involvement in the day-to-day operations of the Company and its financial reporting function. Each Defendant had the power to control or influence the representations giving rise to the securities violations alleged herein.

133.    As set forth in Count I above, each Defendant violated Section 10(b) of the Securities Act by their acts alleged herein. Each Defendant directly or indirectly caused or induced the acts constituting the violations of Section 10(b).

134.    By virtue of their positions as controlling persons, each Defendant is liable to the Class jointly and severally pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

135.    As a direct and proximate result of each Defendant's wrongful conduct, Plaintiff and the Class suffered legally cognizable damages in connection with their purchases of the Company's securities.

## PRAYER FOR RELIEF

136.    WHEREFORE, Plaintiff seeks a judgment against Defendants:

a.      Determining that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class Representative;

b.      Awarding compensatory damages in favor of Plaintiff and the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

c.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d.      Awarding Plaintiff and the Class pre-judgment and post judgment interest; and

e.      Awarding such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

137.    Plaintiff hereby demands a trial by jury.

Dated: August 1, 2023                    Respectfully submitted,

                                         /s/ Michael Dell'Angelo
                                         Michael Dell'Angelo (Bar No. 32581997)
                                         Andrew Abramowitz
                                         James Maro

**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
aabramowitz@bm.net
jmaro@bm.net

Joshua H. Grabar, Esq.
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  267-507-6085
jgrabar@grabarlaw.com

*Counsel for Plaintiff and the Putative Class*

## <u>Civ. Rule 11.2 CERTIFICATION</u>

The undersigned certifies, under penalty of perjury, pursuant to Civ. Rule 11.2, that the matter in controversy in the foregoing Class Action Complaint is not the subject of any other action pending in any court, arbitration forum, or administrative proceeding.

Dated:  August 1, 2023

<p style="margin-left: 40%;">

*/s/ Michael Dell'Angelo*

Michael Dell'Angelo (Bar No. 32581997)
Andrew Abramowitz
James Maro
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
aabramowitz@bm.net
jmaro@bm.net

Joshua H. Grabar, Esq.
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  267-507-6085
jgrabar@grabarlaw.com

*Counsel for Plaintiff and the Putative Class*

</p>

41