Michael Dell'Angelo (Bar No. 32581997)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: mdellangelo@bm.net

*Lead Counsel for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RYAN SHULMAN, individually and on behalf of all others similarly situated,<br><br>     *Plaintiff*,<br><br>  v.<br><br>BRADLEY M. WESTON and TODD E. VOGENSEN,<br><br>     *Defendants*. | Case No. 2:23-cv-04121-JXN-CLW<br><br>**Motion Date: November 4, 2024**<br><br>**CLASS ACTION** |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ................................................................................................. 1

II. STATEMENT OF FACTS ................................................................................... 3

    A.    Pre-Class Period Events ................................................................................ 3

    B.    Party City's Liquidity, Goodwill Balance and Internal Controls ........................... 3

    C.    Defendants Were Planning for Party City's Ultimate Bankruptcy ......................... 4

        1.    Liquidity Shortfalls and Bankruptcy Preparations Began Months Before Filing the Q3 2022 10-Q ......................................................... 4

        2.    Party City Intentionally Delayed Disclosing its Liquidity Crisis ............... 6

    D.    Announcement of the Going Concern Omission and Party City's Dispute with its Auditor ................................................................................................. 6

    E.    The Internal Investigation, SEC Investigation, and Defendants' Resignations ...... 8

    F.    The Q3 2022 10-Q is Restated After the Class Period ......................................... 8

III. ARGUMENT ....................................................................................................... 9

    A.    Legal Standard ........................................................................................... 9

    B.    The Complaint Adequately Alleges Materially False or Misleading Statements and Omissions ........................................................................................... 9

        1.    Defendants Misled Investors About Party City's Liquidity and Borrowing Capacity ......................................................................... 10

            a.    Party City's Liquidity Risk Disclosures Were Inadequate .......... 13

            b.    The Safe Harbor Does Not Apply ................................................ 14

        2.    Defendants Made Materially False Statements about Goodwill ............... 16

            a.    The Goodwill Misstatements are Not Inactionable Statements of Opinion ..................................................................................... 16

        3.    Misstatements about Party City's Internal Controls ............................... 18

        4.    Defendants Violated Item 303 of Regulation S-K .................................. 19

C.      The Complaint Adequately Alleges Defendants' Scienter ................................... 20

      1.      Defendants Had Contemporaneous Knowledge That Contradicted Their Public Statements ..................................................................................... 21

      2.      The Circumstances of E&Y's Resignation Demonstrate Defendants' Scienter ................................................................................................... 23

      3.      The Matters at Issue are Central to the Core Business of the Company ... 24

      4.      Defendants' Motive Supports Scienter ...................................................... 25

      5.      The SEC Investigation, Internal Investigation, Defendants' Resignations, and the Financial Restatement Support Scienter ...................................... 26

D.      Loss Causation is Adequately Pled ........................................................................ 27

E.      Control Person Liability Under Section 20(a) is Adequately Pled ....................... 30

IV. CONCLUSION ................................................................................................................... 30

**TABLE OF AUTHORITIES**

Page(s)

<u>Cases</u>

*Anderson v. McGrath*,
   2012 WL 5381406 (D. Ariz. Nov. 1, 2012)................................................................. 12

*Arnlund v. Smith*,
   210 F. Supp. 2d 755 (E.D. Va. 2002) ....................................................................... 12

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988)................................................................................................. 10

*Belmont v. MB Inv. Partners*,
   708 F.3d 470 (3d Cir. 2013)..................................................................................... 20

*Bielousov v. GoPro, Inc.*,
   2017 WL 3168522 (N.D. Cal. July 26, 2017)............................................................ 15

*Caiafa v. Sea Containers Ltd.*,
   525 F. Supp. 2d 398 (S.D.N.Y. 2007)....................................................................... 10

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004)....................................................................................... 9

*Chapman v. Mueller Water Prod., Inc.*,
   466 F. Supp. 3d 382 (S.D.N.Y. 2020)....................................................................... 27

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
   70 F.4th 668 (3d Cir. 2023) ................................................................................ 17, 19

*Curran v. Freshpet, Inc*,
   2018 WL 394878 (D.N.J. Jan. 12, 2018)................................................................... 15

*D.E.&J. Ltd. P'ship v. Conaway*,
   133 F. App'x 994 (6th Cir. 2005) ............................................................................ 28

*De Vito v. Liquid Holdings Grp., Inc.*,
   2018 WL 6891832 (D.N.J. Dec. 31, 2018)................................................................ 10

*Dudley v. Haub*,
   2013 WL 1845519 (D.N.J. Apr. 30, 2013) ................................................................ 16

*Dura Pharm. Inc, v. Broudo*,
   544 U.S. 336 (2005)................................................................................................. 28

*Edwards v. McDermott Int'l, Inc.*,
   2022 WL 3927828 (S.D. Tex. Aug. 30, 2022) .......................................................... 12

*EnSource Invs. LLC v. Tatham*,
   2017 WL 10648061 (S.D. Cal. Mar. 9, 2017) ........................................................... 12

*Epstein v. World Acceptance Corp.*,
   203 F. Supp. 3d 655 (D.S.C. 2016).......................................................................... 24

*Espinoza v. Whiting*,
   8 F. Supp. 3d 1142 (E.D. Mo. 2014)........................................................................ 12

*Gold v. Ford Motor Co.*,
   577 F. App'x 120 (3d Cir. 2014) .............................................................................. 20

*GSC Partners CDO Fund v. Washington*,
   368 F.3d 228 (3d Cir. 2004)....................................................................................... 9

*Hall v. Johnson & Johnson*,
   2019 WL 7207491 (D.N.J. Dec. 27, 2019)................................................................ 28

*Hull v. Glob. Digital Sols., Inc.*,
2017 WL 6493148 (D.N.J. Dec. 19, 2017)................................................................. 28

*Hurwitz v. LRR Energy, L.P.*,
241 F. Supp. 3d 491 (D. Del. 2017)......................................................................... 16

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010)..................................................................................... 15

*In re Ascena Retail Grp., Inc. Sec. Litig.*,
2022 WL 2314890 (D.N.J. June 28, 2022)................................................................ 18

*In re Bio-Tech. Gen. Corp. Sec. Litig.*,
380 F. Supp. 2d 574 (D.N.J. 2005) ..................................................................... 10, 27

*In re Cambrex Corp. Sec. Litig.*,
2005 WL 2840336 (D.N.J. Oct. 27, 2005)................................................................ 21

*In re Campbell Soup Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) .......................................................................... 24

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) .......................................................... 16

*In re Coinbase Glob., Inc. Secs. Litig.*,
2024 WL 4053009 (D.N.J. Sept. 5, 2024) ........................................................ passim

*In re DVI, Inc. Sec. Litig.*,
2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ............................................................ 28

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015)................................................... 13, 14, 24

*In re Garrett Motion Inc. Sec. Litig.*,
2023 WL 2744029 (S.D.N.Y. Mar. 31, 2023) .......................................................... 12

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) ...................................................................... 18

*In re Great Atl. & Pac. Tea Co., Inc. Secs. Litig.*,
103 F. App'x 465 (3d Cir. 2004) .......................................................................... 9, 21

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018)............................................................................... 25, 27

*In re HEXO Corp. Sec. Litig.*,
524 F. Supp. 3d 283 (S.D.N.Y. 2021)...................................................................... 27

*In re Ikon Off. Sols., Inc. Sec. Litig*,
277 F.3d 658 (3d Cir. 2002)..................................................................................... 23

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
2020 WL 1479128 (E.D. Pa. Mar. 25, 2020)........................................................... 14

*In re Lottery.com, Inc. Sec. Litig.*,
2024 WL 454298 (S.D.N.Y. Feb. 6, 2024)......................................................... 24, 27

*In re Maxwell Techs., Inc. Sec. Litig.*,
18 F. Supp. 3d 1023 (S.D. Cal. 2014)...................................................................... 24

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) ................................................................ 14

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*,
2012 WL 3779309 (D.N.J. Aug. 29, 2012) .............................................................. 30

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*,
2015 WL 2250472 (D.N.J. May 13, 2015)............................................................... 17

iv

*In re MoneyGram Int'l, Inc. Sec. Litig.*,
  626 F. Supp. 2d 947 (D. Minn. 2009) ................................................................................ 12
*In re Novo Nordisk Sec. Litig.*,
  2018 WL 3913912 (D.N.J. Aug. 16, 2018) ...................................................................... 26
*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ................................................................. 27
*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) ........................................................................................... 25
*In re Symbol Techs., Inc. Sec. Litig.*,
  2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) .................................................................. 23
*In re Tellium, Inc. Sec. Litig.*,
  2005 WL 2090254 (D.N.J. Aug. 26, 2005) ..................................................................... 28
*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) ............................................................................ 22
*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  620 F. Supp. 3d 167 (D.N.J. 2022) ................................................................................. 12
*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F. 3d 242 (3d Cir. 2009) ....................................................................................... 9, 22
*Kline v. First W. Gov't Sec., Inc.*,
  24 F.3d 480 (3d Cir. 1994) ............................................................................................. 16
*Macquarie Infrastructure Corp. v. Moab Partners*,
  601 U.S. 257 (2024) ........................................................................................................ 20
*Marsden v. Select Med. Corp.*,
  2007 WL 518556 (E.D. Pa. Feb. 12, 2007) ................................................................... 28
*McCabe v. Ernst & Young LLP*,
  494 F. 3d 418 (3d Cir. 2007) .......................................................................................... 27
*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*,
  2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ............................................................... 25
*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ................................................................................. 29
*No. 231 Pension Fund v. Cowan*,
  837 F. App'x 886 (3d Cir. 2020) ............................................................................... 17, 19
*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ........................................................................................... 20
*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013) ........................................................................................... 26
*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018) ...................................................................... 15
*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) ............................................................................................. 26
*SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*,
  2010 WL 2473595 (S.D.N.Y. June 17, 2010) ................................................................ 12
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................................................................. 20, 21
*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
  176 F. Supp. 3d 387 (D. Del. 2016) ............................................................................... 22

*Vanderhoef v. China Auto Logistics Inc.*,
   2021 WL 3260849 (D.N.J. July 30, 2021)................................................................ 24
*Walzer v. UAL Corp.*,
   351 F. App'x 551 (2d Cir. 2009) ........................................................................... 12
*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017)........................................................... 2, 11, 13, 16
*Woebel v. INTL FCStone, Inc.*,
   2015 WL 14081727 (S.D.N.Y. July 13, 2015) ......................................................... 10
*Wu v. GSX Techedu Inc.*,
   2024 WL 3163219 (D.N.J. June 25, 2024) ....................................................... 24, 30
*Yoshikawa v. Exxon Mobil Corp.*,
   2022 WL 4677621 (N.D. Tex. Sept. 29, 2022)....................................................... 26
*Zwick Partners, LP v. Quorum Health Corp.*,
   2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018)..................................................... 17

Statutes

15 U.S.C. § 78u-5(c)(1)(A)(i) ..................................................................................... 15
15 U.S.C. § 78u-5(c)(1)(B) .......................................................................................... 15

Regulations

17 C.F.R. § 229.303(a)................................................................................................ 19
17 C.F.R. § 229.303(b)(1)(i)........................................................................................ 19

Lead Plaintiff Craig Wigand ("Plaintiff"), individually and on behalf of all others similarly situated, respectfully submits this opposition to the Motion to Dismiss (ECF No. 33-1) ("MTD") filed by defendants Bradley M. Weston and Todd E. Vogensen (collectively "Defendants").

## I.    **INTRODUCTION**

This case arises from material misrepresentations and omissions in Party City's Form 10-Q for the quarter ended September 30, 2022 ("Q3 2022 10-Q") and in its third quarter earnings call. Defendants Weston and Vogensen falsely assured investors concerning Party City's liquidity, internal controls, and the accuracy of the Company's financial reporting. Both Defendants resigned in connection with the Company's subsequent bankruptcy.

The falsity element is easily met here. Just *ten weeks* after filing the Q3 2022 10-Q, Party City abruptly filed for bankruptcy, which it attributed to severe liquidity restraints. Not only was the liquidity crisis previously undisclosed to investors, but Defendants had just affirmatively represented that the Company had adequate liquidity *for the next year*. After filing for bankruptcy, Party City admitted in an SEC filing that the Q3 2022 10-Q contained a "*material error*," should "*no longer be relied on*," and needed to be "*restated*." The SEC filing further acknowledged that Party City "*ought to have disclosed . . . that there was substantial doubt regarding the Company's ability to continue as a going concern*." Party City also admitted that a "material weakness in internal control" existed that should have been disclosed in the Q3 2022 10-Q. Further, Party City admitted that a $155 million goodwill impairment charge should have been recorded in the Q3 2022 10-Q. Given these admissions, the Q3 2022 10-Q contained material misrepresentations and omissions.

Critically, Defendants do not even dispute that the statements made during the Company's third quarter earnings call were false and misleading, only mentioning the earnings call in passing without any affirmative argument in response to Plaintiff's allegations. When addressing

1

Defendants' duty to disclose, Defendants ignore a bedrock principle of federal securities law in the Third Circuit, that "[o]nce a company has chosen to speak on an issue . . . it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017).

Defendants' scienter is equally plain. Defendants' knowledge of the underlying facts is affirmed by information from bankruptcy filings indicating that Defendants were well aware of Party City's severe liquidity constraints several months **before** it filed the Q3 2022 10-Q, and that the liquidity constraints were so severe that Party City began formally preparing for bankruptcy in August 2022. The bankruptcy filings also indicate that Party City intentionally concealed this information from the public. Further, the circumstances surrounding the resignation of the Company's longstanding auditor and subsequent public dispute with its auditor demonstrate scienter. These collective scienter facts, along with numerous other facts alleged in the Complaint, establish a strong inference of Defendants' scienter. Rather than contend with the requirement that scienter facts must be viewed holistically, Defendants attempt to poke individual holes in the allegations while at the same time ignoring the extensive direct and circumstantial facts that show their knowledge and recklessness, and instead proffer their own factual spin that contradicts Plaintiff's allegations—an improper approach at this stage of the proceedings.

On loss causation, Defendants offer more of the same. Disregarding the well pled Complaint, Defendants assert self-serving explanations for Party City's stock price declines. But Plaintiff's loss causation allegations control and easily satisfy Rule 8(a)'s requirements.

The MTD should be denied.

## II.      STATEMENT OF FACTS

### A.      Pre-Class Period Events

Prior to the Class Period,[1] Party City filed its Form 10-Q for the quarter ended March 31, 2022 ("Q1 2022 10-Q") and its Form 10-Q for the quarter ended June 30, 2022 ("Q2 2022 10-Q"). ¶¶34, 39.[2]  Both the Q1 2022 10-Q and Q2 2022 10-Q affirmatively stated that the Company's cash on hand, cash generated from operations, and borrowings available under its credit agreements "will be adequate to meet our liquidity needs for at least the next 12 months." ¶¶35, 40. The Q2 2022 10-Q did not state or imply that the Company's revenue would be insufficient to fund the Company's operations. ¶155. As revealed in the bankruptcy proceeding, the Company retained bankruptcy counsel four days before issuing the Q2 2022 10-Q. ¶153. Two weeks after filing its Q2 2022 10-Q, Party City issued a press release dated August 23, 2022, stating that Party City would be hiring 20,000 seasonal employees for the Halloween season. ¶156.

### B.      Party City's Liquidity, Goodwill Balance and Internal Controls

On November 8, 2022, the first day of the Class Period, Party City filed its Q3 2022 10-Q with the SEC. The Q3 2022 10-Q falsely assured investors that Party City's liquidity was sufficient to "***meet our liquidity needs for at least the next 12 months***." ¶¶12, 157. On an earnings call the same day, Defendant Vogensen stated that the Company was "***improving our liquidity position***," that the Company had a "***number of levers***" by which to obtain additional liquidity, and that the Company "***continue[s] to manage those levers proactively***." ¶¶171-74. Unknown to investors, Party City was facing a current liquidity shortfall, its credit facilities were insufficient to satisfy its

---

[1] The Class Period is from November 8, 2022 to June 9, 2023, inclusive.

[2] References to "¶" refer to paragraphs in the Amended Class Action Complaint ("Complaint") (ECF 24). Unless otherwise noted, all emphasis in quotes is added, internal citations and quotations are omitted, and all capitalized terms have the meanings set forth in the Complaint.

cash needs, it was unable to locate lenders willing to provide additional loans, and it had already begun preparations for bankruptcy. ¶¶49, 158-159.

The Q3 2022 10-Q also disclosed that Party City's goodwill balance was $530 million at September 30, 2022. ¶¶51, 165. There was, however, an undisclosed goodwill impairment resulting in the overstatement of goodwill by $155 million and understatement of the Company's net loss by $148 million (a 62% understatement). ¶¶52, 99, 165. The Q3 2022 10-Q also disclosed that the Company's "disclosure controls and procedures are effective," despite there being several undisclosed then-existing material weaknesses in internal controls. ¶¶53-54, 163-64.

### C. Defendants Were Planning for Party City's Ultimate Bankruptcy

On January 17, 2023, a mere ten weeks after filing the Q3 2022 10-Q, Party City filed for Chapter 11 bankruptcy. ¶55. The bankruptcy filings and exhibits of contemporaneous documents revealed a series of key material issues concealed from investors during the Class Period.

### 1. Liquidity Shortfalls and Bankruptcy Preparations Began Months Before Filing the Q3 2022 10-Q

The bankruptcy documents revealed that Party City began experiencing severe liquidity problems months before the November 8, 2022 filing date of the Q3 2022 10-Q. A declaration filed by a financial advisory firm for Party City stated: "These challenges led to the Debtors materially underperforming expectations since *early 2022*" and "[a]s these financial challenges persisted through the *third . . . quarter[] of 2022*, . . . it became apparent that refinancing and capital raising transactions would not adequately address the Debtors' capital structure challenges." ¶60. This declaration explained that the liquidity shortfalls stemmed in large part from Party City's inability to locate lenders willing to provide additional loans beyond the Company's existing high debt load, stating "all of the Debtors' assets are encumbered and there is not enough value in the Debtors' assets that the Debtors could obtain a sufficiently large financing package."

4

¶62. According to a document filed by Party City in the bankruptcy case, the Company's difficulties locating lenders began prior to November 2022 and the need for cash was due to "long-term capital needs, highly levered capital structure, and short-term liquidity needs." ¶63.

As a result, Party City began preparing for bankruptcy in August 2022, a full three months before filing the Q3 2022 10-Q. A declaration from Party City's Chief Restructuring Officer stated: "*Preparation for Chapter 11*; . . . In *August 2022*, the Debtors retained Paul, Weiss . . . as legal advisor, and, in *October 2022* and *November 2022*, re-engaged AlixPartners and Moelis." ¶65.

According to a declaration filed by Party City's bankruptcy counsel at Paul, Weiss, the "engagement letter between Paul, Weiss and the Debtors, dated as of *September 26, 2022*, . . . sets forth the terms under which Paul, Weiss has agreed to act as counsel for the Debtors to assist them in their *chapter 11 cases*." ¶66. The underlying engagement letter stated: "[Paul, Weiss] began work on the matter, and our engagement is effective, as of *August 4, 2022*." *Id.* According to another declaration by Party City's Chief Restructuring Officer, "AlixPartners has served as financial advisor to the Debtors related to the *chapter 11* cases since *October 2022*." ¶67. A Moelis engagement letter, signed by Defendant Vogensen, stated that Moelis was retained for bankruptcy preparation and related services on "*November 1, 2022*."[3] ¶¶68-69.

Defendants were preparing for bankruptcy since well before the Q3 2022 10-Q was filed. ¶71.[4] Indeed, within the first two days of filing bankruptcy, Party City and its agents submitted 33

---

[3] Defendants incorrectly state that the date of Moelis' retention was "November 22, 2022 – two weeks *after* Party City filed its Form 10-Q." MTD at 10 (emphasis in original). Defendants are mistaken because the Moelis Engagement Letter stated: "[A]s of *November 1, 2022*, . . . legal counsel to Party City . . . engaged Moelis . . .." ¶68; MTD Ex. 12 p. 1.

[4] Defendants argue that Party City hired Paul Weiss, AlixPartners, and Moelis merely to explore "strategic alternatives" and "restructuring alternatives." MTD at 10. In fact, as alleged, the engagement letters and declarations prominently state that the services included "bankruptcy" and "Chapter 11" preparations. ¶¶65-68.

filings in the bankruptcy court totaling nearly 1,500 pages (excluding exhibits). *Id.* A bankruptcy matter of this size, involving the restructuring of over $1 billion in debt among a complex syndicate of lenders, takes more than ten weeks to prepare. *Id.*

### 2.    Party City Intentionally Delayed Disclosing its Liquidity Crisis

Bankruptcy filings revealed that Party City intentionally delayed publicly disclosing its liquidity problems and doubts about its ability to continue as a going concern. ¶79. The Company's Chief Restructuring Officer stated in a declaration that he was concerned about "a mere perception among the Debtors' stakeholders . . . [of] any serious doubt that the Debtors are sufficiently capitalized and liquid to continue as a going concern." ¶75. Similarly, according to another declaration, Defendants were concerned about "trigger[ing] a crisis in vendor confidence, resulting in a significant tightening of trade terms." ¶76. According to a document filed by the Company in the bankruptcy case, "[u]nless the Debtors can demonstrate that they have the means available to operate in the ordinary course . . . vendors and suppliers may refuse to do business with the Debtors." ¶77. Vendor relationships had already begun to fray prior to bankruptcy, as the Chief Restructuring Officer explained: "[L]iquidity constraints have . . . [already] strained vendor relationships. Many . . . vendors have ceased providing ordinary trade credit and begun requiring cash in advance and/or prepayment on future orders before shipping goods." ¶78.

### D.    Announcement of the Going Concern Omission and Party City's Dispute with its Auditor

On June 9, 2023, the last day of the Class Period, Party City filed a Form 8-K stating: (i) a going concern warning should have been included in the Q3 2022 10-Q; (ii) the Q3 2022 10-Q contained a material error, should no longer be relied on, and needed to be restated; (iii) there was a material weakness in internal controls at Q3 2022; and (iv) E&Y resigned as Party City's auditor due to disagreements with the Company. ¶80.

Regarding the going concern issue and E&Y's resignation, the Form 8-K stated:

In its resignation letter, . . . EY concluded that the Company ***ought to have disclosed in the financial statements in the Company's quarterly report on Form 10-Q for the period ended September 30, 2022 (the "Third Quarter Form 10-Q") that there was substantial doubt regarding the Company's ability to continue as a going concern within one year***, resulting in a ***material error*** in such financial statements. ¶81.

The Form 8-K also revealed that the Company had a "***material weakness in internal control over financial reporting*** . . . as of November 8, 2022." ¶83.

When the Company filed bankruptcy, its court filings cast the liquidity issues as matters that would be resolved by additional financing obtained in a bankruptcy restructuring. ¶84. The going concern revelation in the June 9, 2023, Form 8-K shed light on the extent of the Company's liquidity problems, which threatened the Company's very existence. *Id.* Investors were unaware, prior to the June 9, 2023 Form 8-K that the Q3 2022 10-Q contained material errors and should no longer be relied on. ¶85. Importantly, the Company had not issued any other quarterly or annual SEC filings in the interim - meaning the Q3 2022 10-Q was the operative SEC filing from the date it was issued until seven months later when the June 9, 2023 Form 8-K was filed. ¶¶85-86.

The June 9, 2023 Form 8-K included a copy of a letter dated the same day that E&Y sent to the SEC. ¶87. Strikingly, E&Y decided to take this drastic step to describe to the SEC its concerns with the Company's financial reporting, lack of cooperation, and E&Y's view that the Company's Form 8-K announcing its resignation was inaccurate. E&Y's letter stated:

- "[T]he material weakness was identified following an internal investigation initiated after ***EY raised concerns to the Company regarding the accuracy and timeliness of information provided by the Company to EY***, including information relevant to the Company's analysis of ***whether there were conditions or events giving rise to substantial doubt about the Company's ability to continue as a going concern***."

- "The paragraph [of the Form 8-K] omits reference to ***the Company informing EY on multiple occasions that it did not believe it was necessary***

7

to evaluate whether its financial statements for the . . . nine months ending September 30, 2022 were materially misstated, ***and did not provide support for that view in response to multiple requests from EY***."

- "The paragraph [of the Form 8-K] also omits reference to the fact that ***the Company did not respond to multiple requests by EY for further information*** regarding, and support for, the Company's decision not to evaluate the matters referenced above."

- "Given this, ***we disagree with the characterization of EY's resignation*** as 'abrupt.'"

¶87; MTD Ex. 14.

### E. The Internal Investigation, SEC Investigation, and Defendants' Resignations

In April 2023, E&Y raised concerns about the Company's conduct to the Audit Committee. ¶92. In response, the Audit Committee retained a law firm to perform an internal investigation. *Id.* The conclusions of the internal investigation have not been revealed and the investigation ostensibly ended in July 2023. ¶93.The SEC began its own investigation in July 2023, following the admissions in the June 9, 2023 Form 8-K, which is ongoing. ¶188. Defendant Vogensen resigned effective August 20, 2023 and Defendant Weston resigned on November 3, 2023. ¶187.

### F. The Q3 2022 10-Q is Restated After the Class Period

On March 28, 2024, Party City formally restated the Q3 2022 Form 10-Q ("Restated Q3 2022 10-Q"). The restatement added a going concern warning, stating "the Company conclude[s] that there was ***substantial doubt about the Company's ability to continue as a going concern*** [at Q3 2022]." ¶96. The Company also admitted that it, "***fail[ed] to utilize the latest financial forecast information known and reasonably knowable*** [at Q3 2022]." *Id.* Additionally, the restatement added a liquidity warning, stating "we do not believe that [our] sources of liquidity will be adequate to meet our liquidity needs for at least the next twelve months." ¶97.

The restatement provided that the goodwill balance was overstated by $155 million and, as a result, the Company's net loss was understated by $148 million. ¶98. The Company even

admitted that "***more recent projections were available and should have been used*** in the goodwill impairment testing conducted for the quarter ended September 30, 2022." ¶100. Further, the restatement described that ***multiple*** material weaknesses existed at Q3 2022. ¶101.

### III.   ARGUMENT

#### A.   Legal Standard

To state a claim under Section 10(b) of the Securities Exchange Act of 1934, plaintiffs must "allege defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiffs reasonably relied and plaintiff's reliance was the proximate cause of their injury." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F. 3d 242, 251 (3d Cir. 2009). In deciding a Rule 12(b)(6) motion, a court must "accept all allegations in the . . . complaint as true and draw all reasonable inferences in favor of the [plaintiff]." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 236 (3d Cir. 2004). In securities fraud cases, a "motion to dismiss may only be granted when it appears beyond doubt that the plaintiffs can prove no set of facts that would entitle them to relief." *In re Great Atl. & Pac. Tea Co., Inc. Secs. Litig.*, 103 F. App'x 465, 468 (3d Cir. 2004).

#### B.   The Complaint Adequately Alleges Materially False or Misleading Statements and Omissions

Pleading falsity requires alleging facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). Under the PSLRA, a complaint must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent…the who, what, when, where and how." *Avaya*, 564 F.3d at 253. An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered

9

the 'total mix' of information." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

As an initial matter, falsity is readily met here given the existence of the restatement which, by definition, is an admission that the financial statements were materially false or misleading when issued. Courts in this District and elsewhere routinely hold that the existence of a restatement satisfies the falsity element. *See, e.g., De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *32 (D.N.J. Dec. 31, 2018) ("By definition, a restatement corrects financial data that was false when made."); *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 586 (D.N.J. 2005) ("a restatement . . . in itself establishes the falsity of the original statements for purposes of surviving a motion to dismiss"); *Woebel v. INTL FCStone, Inc.*, 2015 WL 14081727, at *7 (S.D.N.Y. July 13, 2015) ("In light of the restatement . . . the allegations of falsity are sufficient"); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) ("the mere fact that . . . [financial] statements were restated at all is sufficient to establish falsity at the pleading stage").

### 1. Defendants Misled Investors About Party City's Liquidity and Borrowing Capacity

The Q3 2022 10-Q, filed on November 8, 2022, falsely assured investors that Party City's liquidity was sufficient by affirmatively stating:

- "We expect to rely on cash on hand, cash generated by operations, and borrowings available under our credit agreements to meet our working capital needs and [they] will be our principal sources of liquidity. . . . [W]e believe that ***these sources will be adequate to meet our liquidity needs for at least the next 12 months***." ¶¶12, 157.

- "***Based on our current operations and planned strategic initiatives…we expect to satisfy our short-term and long-term cash requirements*** through a combination of our existing cash and cash equivalent position, funds generated from operating activities, and ***the borrowing capacity available under our credit agreement***." ¶157.

On the third quarter earnings call held the same day, Defendants Weston and Vogensen spoke to investors and fielded questions from analysts. On the call, Vogensen provided specific

details[5] regarding the Company's liquidity and explained that the Company was "***improving our liquidity position***…in summary we're pleased with our third quarter results." ¶¶171-72. During a Q&A with analysts on the call, Vogensen stated that the Company had a "***number of levers***" by which to obtain additional liquidity, and that the Company "***continue[s] to manage those levers proactively***." ¶¶173-74. Tellingly, Defendants do not even address these statements made on the earnings call, only mentioning the call and the related paragraph numbers of the Complaint in passing. Therefore, Plaintiff's specific allegations regarding the falsity of Defendants' statements made on the third quarter earnings call (¶¶171-74) are left unchallenged.

Defendants' statements created the false impression that the Company was not facing dire liquidity constraints. Defendants' statements gave no indications that Party City was facing a then-existing liquidity shortfall, its credit facilities were insufficient to satisfy its cash needs, it was unable to locate lenders willing to provide additional loans, and it had already begun preparations for bankruptcy. ¶¶48, 49, 158, 172, 174-75.[6] In fact, at the time these statements were made, there was a substantial doubt about the Company's ability to continue as a going concern and, as later admitted, a going concern warning should have been included in the Q3 2022 10-Q. ¶50.

Defendants chose to speak affirmatively and tout the Company's liquidity. Once Defendants chose to make affirmative statements about the liquidity position, it triggered a duty to speak truthfully and completely about the Company's liquidity. *See Williams*, 869 F.3d at 241 ("Once a company has chosen to speak on an issue . . . it cannot omit material facts related to that

---

[5] Vogensen noted on the earnings call that, "[Party City] ended the quarter with $122 million in total liquidity, comprised of $30 million in cash and $92 million of revolved liability." ¶171.

[6] To the contrary, the Company disclosed that it had had "total liquidity of $121.5 million," including $91.7 million available from its credit lines. ¶¶47, 157. Other information in the Q3 2022 10-Q reinforced that liquidity was sufficient, giving investors no reason to anticipate a liquidity crisis. *See, e.g.* ¶¶160-61.

issue so as to make its disclosure misleading."); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) ("Defendants may not describe a favorable picture of [a] material issue without including the details that would have presented a complete and less favorable one."); *In re Coinbase Glob., Inc. Secs. Litig.*, 2024 WL 4053009, at *10 (D.N.J. Sept. 5, 2024) (same).[7] By omitting the Company's liquidity problems, Defendants concealed material facts necessary to make the affirmative liquidity disclosures not misleading.

Ignoring Plaintiff's allegations, Defendants question whether Party City had an affirmative duty to disclose its plans to file bankruptcy, a byproduct of the concealed liquidity problems. MTD at 3, 15-16, 26-27. Regardless of this miscast argument, at issue here is that Defendants were required to speak truthfully and completely. This includes disclosing the liquidity problems facing the Company, regardless of any separate duty to disclose the forthcoming bankruptcy.[8]

Further, Defendants had a duty under GAAP to analyze the Company's "liquidity sources" and "access to credit" when conducting the going concern analysis. ¶106. Defendants were well

---

[7] Defendants' out-of-circuit cases (MTD at 15-16, 26-27) are distinguishable. *See In re Garrett Motion Inc. Sec. Litig.*, 2023 WL 2744029, at *13-15, 20 (S.D.N.Y. Mar. 31, 2023) (bankruptcy was "not . . . imminent" and defendant adequately "warned investors that a restructuring was possible"); *Edwards v. McDermott Int'l, Inc.*, 2022 WL 3927828, at *5 (S.D. Tex. Aug. 30, 2022) (defendants "repeatedly [disclosed] . . . McDermott's liquidity problems"); *Espinoza v. Whiting*, 8 F. Supp. 3d 1142, 1154 (E.D. Mo. 2014) ("plaintiffs do not have any evidence that the defendants were considering bankruptcy"); *Walzer v. UAL Corp.*, 351 F. App'x 551, 553 (2d Cir. 2009) (plaintiff did not allege affirmative disclosures); *SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*, 2010 WL 2473595, at *11 (S.D.N.Y. June 17, 2010) ("Plaintiff does not identify any document . . . indicat[ing] . . . Countrywide was . . . considering bankruptcy.").

[8] In any event, courts have upheld Section 10(b) claims alleging a failure to disclose a forthcoming bankruptcy. *See, e.g. EnSource Invs. LLC v. Tatham*, 2017 WL 10648061, at *5 (S.D. Cal. Mar. 9, 2017) ("Defendants failed to disclose that Hopewell was on the verge of bankruptcy. . . the complaint sufficiently alleges a material omission."); *Anderson v. McGrath*, 2012 WL 5381406, at *5 (D. Ariz. Nov. 1, 2012) (defendants "should have disclosed . . . that the company was actively considering the possibility of bankruptcy"); *In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 978 (D. Minn. 2009) ("concealing [the] need to explore bankruptcy. . . may have misled a reasonable investor"); *Arnlund v. Smith*, 210 F. Supp. 2d 755, 764 (E.D. Va. 2002) (similar).

aware of the liquidity shortfalls at the time of the Q3 2022 10-Q and the facts were available to Defendants at the time to reach an adverse going concern conclusion. ¶105. Instead, Defendants issued the materially false 3Q 2022 10-Q without including a going concern warning.

### a. Party City's Liquidity Risk Disclosures Were Inadequate

Party City's liquidity risk disclosures do not shield Defendants from liability. Party City merely disclosed the risk that its liquidity could hypothetically deteriorate in the future and its borrowings could hypothetically become unavailable. MTD at 7, 9. Defendants rely primarily on four boilerplate risk disclosures related to liquidity.[9] These disclosures were not tailored to the then-existing fact that liquidity was already severely strained, and lenders were already refusing to lend additional funds. Disclosures of hypothetical risks are inadequate when the risk has already materialized or nearly materialized. *See Williams*, 869 F.3d at 241 ("[A] company may be liable under Section 10(b) for misleading investors when it describes as hypothetical a risk that has already come to fruition."); *Coinbase*, 2024 WL 4053009 at *13 n.19 ("[G]eneric warnings of a risk do not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability [of the risk materializing]."); *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *11, 22 (D.N.J. Dec. 15, 2015) ("[E]ven though Defendants warned generally of significant and increasing [risk] . . . these risks had already come to pass and . . . it

---

[9] Those disclosures stated (MTD at 7, 9):
- "[Sources of financing] may not be available to us on satisfactory terms or at all, which could have a material adverse effect on our business, liquidity, and stock price."
- "Our business, results of operations, financial condition and liquidity have been and may continue to be materially and adversely affected by COVID-19."
- "[W]e cannot assure you . . . that . . . future borrowings will be available to us under the Company's credit facilities and in amounts sufficient to enable us to . . . fund our other liquidity needs."
- "There can be no assurance equity or debt financing will be available to us when we need it or, if available, the terms will be satisfactory to us . . . ."

13

was therefore unreasonable to make generalized warnings"). Further, all of the Company's risk disclosures were overbroad because they could apply to any public company. *See In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *17 (E.D. Pa. Mar. 25, 2020) ("courts have rejected the alleged significance of boilerplate warnings true to every company").

Additionally, Defendants point to risk disclosure that were from Party City's Form 10-K for the year ended December 31, 2021 (*see* MTD at 7), which was issued nine months prior to the Q3 2022 10-Q and became stale. Defendants also point to risk disclosures regarding COVID and a purported helium shortage. MTD at 6. These disclosures are not tailored to the existing facts that Party City was in the midst of a liquidity crisis and had insufficient borrowing capacity. ¶¶62-63.

Defendants reference the risk disclosures to also argue that the market was aware of the Company's liquidity and borrowings problems. But those arguments are a truth on the market defense. Such a defense is highly fact-specific because Defendants must show that the curative information was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 2011 WL 3444199, at *35 (D.N.J. Aug. 8, 2011); *accord Enzymotec*, 2015 WL 8784065 at *16 ("truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint"). Here, the risk disclosures did not reveal existing problems with liquidity and borrowings, just generic hypothetical problems that do not counter-balance Defendants' misstatements.

### b.    The Safe Harbor Does Not Apply

Defendants argue that certain of the statements regarding the Company's liquidity and cash needs are protected by the PSLRA's safe harbor. MTD at 18-19. As a threshold matter, none of Defendants' statements are forward looking, but rather statements of current fact that are not entitled to protection under the safe harbor. *See Curran v. Freshpet, Inc.*, 2018 WL394878, at *4

14

(D.N.J. Jan. 12, 2018) (safe harbor "does not apply to a mixed present/future statement . . . with respect to the part of the statement that refers to the present"). Here, the safe harbor does not apply because Plaintiff "challenge[s] defendants' alleged omission of present facts with respect to the challenged statements." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *7 (D.N.J. July 27, 2018); *accord Curran*, 2018 WL 394878 at *4 ("omissions of existing facts or circumstances do not constitute forward-looking statements protected by the safe harbor").

Defendants challenge the statement, "we believe that these sources will be adequate to meet our liquidity needs for at least the next 12 months." MTD at 18. Similarly, Defendants challenge the statement that "we expect to satisfy our short-term and long-term cash requirements through a combination of our existing cash…and borrowing capacity." MTD at 18-19. These statements are not forward-looking because they are statements of present opinion that contain current facts and omit facts necessary to make the statements not misleading. *See Bielousov v. GoPro, Inc*., 2017 WL 3168522, at *4 (N.D. Cal. July 26, 2017) (statement "included the phrase 'we believe,' and therefore . . . [was] a factual statement of . . . present opinion, not a forward-looking statement").

Even if any of Defendants' statements are forward-looking (they are not), Defendants had knowledge of the falsity of the statements due to their awareness of the present liquidity crisis. The safe harbor for forward-looking statements does not apply if the speaker had, as here, "actual knowledge . . . that the [forward looking] statement was false or misleading" when made. 15 U.S.C. § 78u-5(c)(1)(B); *see also In re Aetna, Inc. Sec. Litig*., 617 F.3d 272, 278-79 (3d Cir. 2010) ("[T]he safe harbor applies to statements that are forward-looking . . . provided that they are . . . made without actual knowledge that the statement was false or misleading.").

Defendants' safe harbor argument can also be rejected because none of the misstatements are "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). The

15

purported cautionary statements (*i.e.*, risk disclosures discussed above) are inadequate. *See Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490-91 (3d Cir. 1994) ("Not just any cautionary language will trigger application of the doctrine. Instead, disclaimers must relate directly to that on which investors claim to have relied.").[10] Further, the purported cautionary language failed to disclose specific "risks that ha[d] already materialized." *Williams*, 869 F. 3d at 241.

### 2. Defendants Made Materially False Statements about Goodwill

The Q3 2022 10-Q stated that Party City's goodwill balance was $530 million at September 30, 2022. ¶¶51, 165. Unbeknownst to investors, goodwill was overstated by $155 million due to undisclosed goodwill impairment, a material misstatement representing 29% of the Company's goodwill balance. ¶99. These are actionable misstatements. *See Dudley v. Haub*, 2013 WL 1845519, at *11 (D.N.J. Apr. 30, 2013) (falsity pled where "possible indicators of impairment" existed, including "sustained operating losses," "a decrease in [the company's] market capitalization below [] book value," and "a significant adverse change . . . in the business climate"); *see also In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *7 (S.D.N.Y. May 24, 2018) ("allegations from which a reader could infer [d]efendants intentionally or recklessly failed to take write downs when they should have" suffice).

### a. The Goodwill Misstatements are Not Inactionable Statements of Opinion

Defendants' argument that the goodwill misstatement was an "opinion statement" immune from liability fails. MTD at 20-22. There are three exceptions to opinion statement immunity that apply here – the goodwill balance: (i) was "not sincerely believed when made"; (ii) contained an

---

[10] Defendants' reference to the "bespeaks caution" doctrine (MTD at 19 n.4) fails for similar reasons, namely the cautionary statements and risk disclosures are inadequate. *See Hurwitz v. LRR Energy, L.P.*, 241 F. Supp. 3d 491, 504 (D. Del. 2017) ("If defendants knew at the time [of the false statement] that Vanguard did not have sufficient liquidity. . .the warnings are not sufficient to warrant the application of the bespeaks caution doctrine.").

"expressly embedded, untrue factual assertion"; *or* (iii) "omit[ted] material facts about [Defendants'] knowledge concerning [the] statement of opinion." *See City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc*., 70 F.4th 668, 686 (3d Cir. 2023) ("an opinion statement is misleading if it: (i) was not sincerely believed when made; [or] (ii) contains an expressly embedded, untrue factual assertion"); *Laborers Loc. No. 231 Pension Fund v. Cowan*, 837 F. App'x 886, 891 (3d Cir. 2020) (opinion statement liability exists if opinion "omits material facts about the . . . knowledge concerning [the] statement of opinion"). While it is only necessary to plead one of these exceptions, each of the exceptions apply to the goodwill misstatements here.

*First*, the goodwill balance was not sincerely believed by Defendants because they were aware of then-existing liquidity problems impairing goodwill. Notably, GAAP requires companies to conduct annual goodwill impairment tests and, in so doing, consider factors such as "limitations on accessing capital" and "contemplation of bankruptcy." ¶112 (quoting ASC 350-20). Those GAAP factors, among others (*see* ¶¶112-18), strongly favored impairment of the goodwill balance at Q3 2022. *See Zwick Partners, LP v. Quorum Health Corp*., 2018 WL 2933406, at *6 (M.D. Tenn. Apr. 19, 2018) (in light of "the underlying 'red flags' . . . decisions not to . . . take those impairments . . . were fraudulent" because their "assurances (by their failures to test and take additional impairments) did not fairly align with the information in [their] possession at the time").

*Second*, the goodwill balance contained an "embedded, untrue factual assertion," namely Party City's statement in the Q3 2022 10-Q that "[goodwill] [i]mpairment testing is based upon the best information available." ¶166. That was demonstrably false because the Company later admitted that "more recent projections were available and should have been used in the goodwill impairment testing [at Q3 2022]." *Id. See In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 2015 WL 2250472, at *20-21 (D.N.J. May 13, 2015) (opinion statements were misleading where

17

they misrepresented that company was in possession of facts justifying the opinions).

*Third*, Party City omitted critical facts about its knowledge underlying the goodwill balance – specifically that liquidity problems existed, and the Company used outdated projections in its impairment testing.[11] *See In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 779 (E.D. Va. 2015) (opinion statements actionable where reserve statements omitted that defendants "relied on outdated data in calculating reserves").

*Finally*, Party City's goodwill risk disclosures do not shield Defendants from liability. Providing a risk factor in the 2021 Form 10-K stating that economic conditions may change (MTD at 7-8) does nothing to counterbalance the undisclosed goodwill impairment many months later in the 3Q 2022 10-Q. Similarly, warning that different assumptions and estimates could result in material impairment charges in the future (MTD at 8) does not address the Company's use of outdated projections and failure to disclose that goodwill was impaired. *See* ¶¶165-66.

### 3.    Misstatements about Party City's Internal Controls

Defendants Weston and Vogensen made false representations in SEC filings about Party City's internal controls, including that each of them designed (or had overseen the design of) such internal controls and that the controls were "***designed…to provide reasonable assurance***" of compliance, "***fairly present[ed], in all material respects***" the Company's results, and that they "concluded that our ***disclosure controls and procedures are effective***." ¶¶53, 163, 167.

In fact, as later admitted, Defendants did not design and maintain effective controls over financial reporting, rather there were multiple "material weaknesses in internal control over

---

[11] Defendants rely heavily on *In re Ascena Retail Grp., Inc. Sec. Litig.*, 2022 WL 2314890, at *2-4, 7 (D.N.J. June 28, 2022) for the proposition that goodwill valuations require subjective judgment. MTD at 20-22. *Ascena* is of limited relevance because it did not involve a restatement and was focused on subjective judgment. The present case involves objective matters that bear on goodwill such as liquidity problems, bankruptcy preparation, and the use of outdated projections.

financial reporting." ¶¶54, 101, 163-64. These control deficiencies resulted in material misstatements, contributing to the need for a restatement. *Id.* Prior to the restatement, Party City admitted in the June 9, 2023 Form 8-K that the original Q3 2022 10-Q contained a "material error" and should "no longer be relied on." ¶81.

Defendants' claim that the SOX certifications are inactionable statements of opinion. MTD at 24. Defendants also argue that the allegations of material weaknesses are "too conclusory and vague." *Id.* at 23. Defendants are wrong on both points. Similar to the reasons described above for the goodwill misstatements (*supra* at § III.B.4.a), the SOX certifications contain "an expressly embedded, untrue factual assertion" and, even if it is an opinion in part, "omits material facts about the . . . knowledge concerning [the] statement of opinion." *See Prudential Fin., Inc.*, 70 F.4th at 686; *Cowan*, 837 F. App'x at 891. Both in the June 9, 2023 Form 8-K and Restated Q3 2022 10-Q, Party City admitted that material weaknesses existed, provided details of the weaknesses, and stated that the weaknesses led to financial reporting errors in the Q3 2022 Form 10-Q. ¶¶83, 101.[12]

### 4. Defendants Violated Item 303 of Regulation S-K

Item 303 requires public companies to "[i]dentify any known . . . events or uncertainties that . . . are reasonably likely to result in the registrant's liquidity . . . decreasing in any material way." 17 C.F.R. § 229.303(b)(1)(i); ¶123. It also requires companies to provide an "evaluation of the amounts and certainty of cash flows from . . . outside sources." 17 C.F.R. § 229.303(a); ¶126. Accordingly, Defendants had a duty to disclose the then-existing fact that Party City was experiencing liquidity shortfalls, its borrowings were insufficient, and it was unable to locate lenders willing to provide additional funds. ¶125. Notably, Item 303 requires disclosure if the impact on liquidity is merely "*likely*" to occur – it need not be a certainty. 17 C.F.R. § 229.303(a)

---

[12] For these reasons, Defendants' authorities are readily distinguishable (*see* MTD at 23-24).

& (b)(1)(i); ¶127. Thus, even if Defendants did not know for certain, they still had a duty to disclose that a material liquidity issue was "likely" to occur due to the Company's inadequate borrowings and inability to locate new lenders. Defendants did not do so.

Defendants' argument that *Macquarie Infrastructure Corp. v. Moab Partners*, 601 U.S. 257 (2024) forecloses their liability for violating Item 303 fails. MTD at 17. *Macquarie* merely held that Item 303 liability cannot be purely omission-based. *Macquarie*, 601 U.S. at 260 ("Pure omissions [under Item 303] are not actionable under Rule 10b-5(b)."). Here, Plaintiff's claims are not purely omission-based. Defendants made several affirmative statements about liquidity, which were misleading in light of the Item 303 omissions. *See supra* at § III.B.1.

Finally, Defendants' argument that there were no "trends or uncertainties actually known by Defendants" clearly fails. MTD at 17. Defendants knew of adverse trends and uncertainties regarding the Company's liquidity and insufficient borrowings. Indeed, that is what prompted Defendants to begin exploring bankruptcy in the first place. *See supra* at § II.C.1; ¶¶59-71.

### C.    The Complaint Adequately Alleges Defendants' Scienter

"Under the PSLRA, a plaintiff properly pleads scienter by alleging facts that constitute circumstantial evidence of either reckless or conscious behavior." *Gold v. Ford Motor Co.*, 577 F. App'x 120, 123 (3d Cir. 2014). Recklessness is defined as an "extreme departure from the standards of ordinary care . . . which presents a danger of misleading [investors] that is either known to the defendant or is so obvious that the [defendant] must have been aware of it." *Belmont v. MB Inv. Partners*, 708 F.3d 470, 493 (3d Cir. 2013).

The inference of scienter must be "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Thus, a "tie [on scienter] favors the plaintiff on a motion to dismiss." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 214 (5th Cir. 2023). The evidence needed to

20

plead scienter "need not be . . . of the 'smoking-gun' genre." *Tellabs*, 551 U.S. at 324. "The inquiry

. . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter,

not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.

### 1. Defendants Had Contemporaneous Knowledge That Contradicted Their Public Statements

Information from bankruptcy filings shows that Defendants knew about Party City's severe

liquidity problems several months before filing the Q3 2022 10-Q. *See supra* at § II.C.1; ¶¶59-71.

The problems were so dire that they prompted Party City to retain bankruptcy counsel and begin

bankruptcy preparations in August 2022, three months before filing the Q3 2022 10-Q. *Id.* Despite

that knowledge, Defendants omitted the material adverse information in its statements to investors.

Defendants' knowledge of these facts establishes a strong inference of their scienter. *See Coinbase*,

2024 WL 4053009 at *15 (scienter may be met by alleging defendants' "knowledge of facts or

access to information contradicting their public statements . . . , [that] defendants knew or, more

importantly, should have known that they were misrepresenting material facts"); *In re Cambrex*

*Corp. Sec. Litig.*, 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005) ("To adequately plead scienter,

it is sufficient for plaintiffs to allege that defendants had knowledge of facts or access to

information that contradicts their statements."); *Great Atl. & Pac. Tea*, 103 F. App'x at 469

("When the alleged fraud is based on non-disclosure of facts, evidence that the defendants had

actual knowledge of the facts is sufficient to show scienter.").[13]

Importantly, both Defendants Weston and Vogensen had prominent speaking roles on the

third quarter earnings call during which Vogensen made his misleading statements. ¶¶175, 190.

---

[13] Defendants argue Plaintiff has not shown the Company's bankruptcy was definite (MTD at 26). There is no such requirement to support falsity or scienter. Defendants' authorities merely stand for the proposition that "standing alone" retaining financial advisors does not raise an inference of scienter and that silence does not necessarily give rise to a duty to disclose. *See* MTD at 26-27.

21

Despite having this platform to correct Vogensen's misleading statements, Weston recklessly chose not to do so. *Id.* Given that Defendants all but ignore this earnings call, the particularized scienter allegations addressing this earnings call are left unchallenged. *See id.*

The close proximity in time (ten weeks) between filing the Q3 2022 10-Q and filing for bankruptcy also supports scienter. *See Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 395-96 (D. Del. 2016) ("The temporal proximity of the misrepresentations in relation to the truth's revelation may also be considered in determining . . . scienter."); *Avaya*, 564 F.3d at 272 ("proximity" of the rosy statements "to the . . . release of Avaya's disappointing results" supported inference of scienter). The liquidity crisis did not evolve overnight, and a reasonable inference exists that Defendants were aware of the underlying problems for months if not longer. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 554 (S.D.N.Y. 2011) ("it is rational to infer that a liquidity crisis severe enough to threaten Vivendi's very existence did not develop overnight").

Defendants contend that the Complaint relies on fraud by hindsight. It does not, as the allegations make plain. Defendants also criticize the Complaint for not containing confidential witnesses. MTD at 2, 21. However, confidential witnesses are not a prerequisite to pleading securities fraud; especially so here, where bankruptcy documents and findings from E&Y provide strong contemporaneous support of knowledge and reckless conduct. Defendants incorrectly claim the Complaint does not reference contemporaneous documents indicating Defendants' knowledge of the need for a going concern warning. MTD at 2. In fact, the Complaint cites numerous documents filed in the bankruptcy case indicating that Defendants were aware of severe liquidity problems prior to issuing the Q3 2022 10-Q. *See supra* at § II.C.1; ¶¶59-71.

As described above, information from bankruptcy filings also show that Party City

22

intentionally delayed publicly disclosing its liquidity problems, need for bankruptcy, and going concern issues due to fear of how the Company's vendors and other stakeholders would react. *See supra* at § II.C.2*; ¶¶*74-78. This evidence of intentional concealment satisfies scienter. *See In re Ikon Off. Sols., Inc. Sec. Litig*, 277 F.3d 658, 674 (3d Cir. 2002) ("scienter [includes] a mental state suggesting an intent to conceal"). Any purported business concerns as the basis for such actions do not negate the reckless intentional concealment. Tellingly, Defendants do not address this intentional concealment when addressing scienter in their MTD.

### 2. The Circumstances of E&Y's Resignation Demonstrate Defendants' Scienter

E&Y, Party City's long-time auditor, resigned due to disputes with management. In connection with its resignation, E&Y wrote a critical letter to the SEC stating that Party City: (i) provided inaccurate information to E&Y regarding the going concern issue; (ii) resisted evaluating whether the Q3 2022 10-Q should be restated in the aftermath of bankruptcy; (iii) failed to provide information responsive to E&Y's concerns despite multiple requests; and (iv) misleadingly described the disagreements with E&Y in the June 9, 2023 Form 8-K. *Supra* § II.D; ¶87; MTD Ex. 14. These facts at least illustrate reckless conduct. They also strengthen the inference that Defendants acted recklessly when issuing the Q3 2022 10-Q because they show a propensity for misconduct. *See In re Symbol Techs., Inc. Sec. Litig*., 2013 WL 6330665, at *10 (E.D.N.Y. Dec. 5, 2013) ("a pattern of culpable conduct . . . supports a strong inference of scienter").

Defendants Weston and Vogensen, as overseers of Party City's financial reporting and internal controls, were at the forefront of the issues raised by E&Y and are responsible for the reckless conduct revealed in the letter. *See, e.g.* ¶¶19-21, 91, 177-78, 235-37. Vogensen oversaw the Company's relationship with E&Y, signed E&Y's engagement letter for the 2022 audit, and attended at least eighteen meetings and calls with E&Y from January 2023 to May 2023. ¶91.

Even without E&Y's scathing letter and the circumstances surrounding E&Y's resignation, an auditor resignation can contribute to an inference of scienter. *See Vanderhoef v. China Auto Logistics Inc.*, 2021 WL 3260849, at *5 (D.N.J. July 30, 2021) ("auditor resignations . . . may . . . support . . . an inference [of corporate scienter]"); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671-72 (D.S.C. 2016) (auditor resignation contributed to inference of corporate scienter).[14]

### 3. The Matters at Issue are Central to the Core Business of the Company

The "core operations" doctrine further contributes to an inference of scienter. *See Wu v. GSX Techedu Inc.*, 2024 WL 3163219, at *29 (D.N.J. June 25, 2024) (scienter found for revenue and enrollment numbers explaining "company leaders are more likely to be focused on the heart of the venture"); *Enzymotec*, 2015 WL 8784065 at *18 (inference of scienter found where the "matter at issue is central to the core business of the Company"); *In re Campbell Soup Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("knowledge may be imputed to . . . defendants when the disclosures involve the company's core business"). Here, liquidity issues were so critical to the Company that it threatened the Company's very survival. ¶191. Borrowings were a central part of Party City's operations, representing more than half of the Company's liabilities. *Id.*

Further, Defendants' positions as CEO and CFO are probative of scienter. *See GSX Techedu Inc.*, 2024 WL 3163219 at *27 ("courts routinely look to a person's position in a given company to determine whether the person's statements were made with scienter…As for publicly-

---

[14] The cases Defendants cite (MTD at 32) are inapposite because they merely hold that auditor resignations alone cannot establish scienter. *See In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1039 (S.D. Cal. 2014) ("resignation **alone**" does not give rise to a strong inference of scienter"); *In re Lottery.com, Inc. Sec. Litig.*, 2024 WL 454298, at *35 (S.D.N.Y. Feb. 6, 2024) (auditor resignation cannot "**solely**" satisfy scienter). Notably, *Maxwell* **supports** Plaintiff's position because the court stated that an "auditor's resignation…may, under certain circumstances, support an inference that the company was misrepresenting…its financial health" and the court "consider[ed] the resignation in the holistic analysis" of scienter. *Maxwell* at 1039-40.

24

reported revenue numbers, that was plainly within the CFO's job description"). Scienter is further bolstered by Defendants signing SOX certifications. ¶¶177-78. Defendants' own quoted authority supports the position that the signing of a SOX certification "attesting to the accuracy of an SEC filing that turned out to be materially false" is probative of scienter if the signer "recklessly disregarded inaccuracies contained in an SEC filing." *See* MTD at 31 (quoting *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018)). Plaintiff has established that Defendants at least "recklessly disregarded inaccuracies contained in an SEC filing."

### 4.      Defendants' Motive Supports Scienter

Stock sales by defendants may contribute to scienter where: (i) the sales represent a large portion of the defendant's holdings, or (ii) the volume of sales during the class period materially exceeds the volume in the comparative pre-class period. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (motive factors include "portion of stockholdings sold"); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, 2016 WL 5794774, at *18 (S.D.N.Y. Sept. 30, 2016) ("change in volume of insider defendant's sales").

Defendants' stock sales during the Class Period represented a large percentage of their holdings. Defendant Weston's sales totaled 20% of the shares he held at the beginning of the Class Period, and Defendant Vogensen's sales totaled 24% of the shares he held. ¶141. *See Suprema*, 438 F.3d at 278 (suspicious sales for motive purposes where "each officer . . . sold over 30 percent of his holdings"). Also, the volume of Defendants' sales during the Class Period materially exceeded the volume during the comparable pre-class period. ¶140.[15] While "it is not necessary to plead motive to establish that a defendant acted with scienter, its presence can be persuasive when

---

[15] Defendants' argument that they sold their shares merely to pay taxes is a question of fact and, regardless, unpersuasive because they nevertheless received a financial benefit from those sales. MTD at 37.

conducting a holistic review." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013).

**5.    The SEC Investigation, Internal Investigation, Defendants' Resignations, and the Financial Restatement Support Scienter**

The SEC initiated an investigation of Party City's financial reporting following the admissions in the Company's June 9, 2023 Form 8-K. ¶188. This contributes to an inference of scienter. *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 80-81 (2d Cir. 2021) (existence of SEC investigation "bolster[s] the inference" of scienter); *Yoshikawa v. Exxon Mobil Corp.*, 2022 WL 4677621, at *4 (N.D. Tex. Sept. 29, 2022) ("several courts have held that SEC investigations are relevant to scienter") (collecting cases).[16]

The resignations of Defendants Weston and Vogensen further support the holistic scienter analysis. In April 2023, E&Y raised concerns about the Company's conduct to the Audit Committee. ¶92. In response, the Audit Committee retained a law firm to perform an internal investigation.[17] *Id.* The Audit Committee did not publicly reveal conclusions from the investigation, but it led to the admissions in the June 9, 2023 Form 8-K. ¶187. The SEC began its own investigation in July 2023. ¶188. Both Defendants resigned shortly thereafter – Vogensen resigned in August 2023 and Weston resigned in November 2023. ¶93. The timing of the resignations following these investigations supports an inference that Defendants resigned due at least in part to issues underlying the investigations. ¶¶93, 187. *See In re Novo Nordisk Sec. Litig.*, 2018 WL 3913912, at *8 (D.N.J. Aug. 16, 2018) (officer departures "contribute to a finding of

---

[16] Defendants' citation to contrary cases (MTD at 34-35) merely reflects that different courts have reached different conclusions. Where there is strong evidence of scienter beyond the SEC investigation itself, the SEC investigation can add weight to the scienter calculus. The SEC investigation is ongoing and has not exonerated Party City.

[17] Defendants argue that the Audit Committee's investigation cuts against scienter because it shows that Party City acted proactively to investigate E&Y's concerns. MTD pg. 34. But the Audit Committee merely did what any reasonable Audit Committee would do in response to such serious issues. The Audit Committee did not indicate that the investigation results exonerated Defendants.

scienter"); *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) ("The timing of . . . resignations . . . can be a strong inference of scienter.") (collecting cases).[18]

The existence of a restatement also contributes to the inference of scienter. *See In re Bio-Tech.*, 380 F. Supp. 2d at 588 (a "restatement of financial results is probative of scienter"); *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 414 (S.D.N.Y. 2020) ("Where the restatement . . . takes place in a core part of the business, those facts may contribute to an inference of scienter."). Moreover, Defendants had a duty under GAAP to analyze the Company's liquidity when performing the going concern analysis at Q3 2022. ¶¶103-09. Given the GAAP obligations and the Company's then-existing liquidity shortfalls, Defendants' conduct was reckless in failing to include a going concern warning in the Q3 2022 10-Q. *Id.*[19]

When viewed holistically as required by *Tellabs*, the collective facts establish a strong inference of Defendants' scienter.

### D. Loss Causation is Adequately Pled

"Allegations of loss causation are not subject to the heightened pleading requirements…all that is required is that plaintiff provide some indication of the loss and the causal connection that the plaintiff has in mind, consistent with Rule 8(a)." *Coinbase*, 2024 WL 4053009 at *17. The Third Circuit takes a "practical approach [to loss causation], in effect applying general causation principles," requiring only that "the misrepresentation touches upon the reasons for the investment's decline in value." *McCabe v. Ernst & Young LLP*, 494 F. 3d 418, 426, 428 (3d Cir.

---

[18] Defendants' cases are distinguishable. MTD at 33. *See Lottery.com*, 2024 WL 454298, at *34 (insufficient allegations tying resignations to wrongdoing); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 315 (S.D.N.Y. 2021) (resignations occurred "amidst bad financial news" rather than fraud); *In re Hertz Glob. Holdings Inc*, 905 F.3d 106, 118 (3d Cir. 2018) (complaint "lacks allegations that those resignations were a result of [their] . . . involvement in [the] fraud").

[19] Defendants' own authorities confirm that allegations regarding a restatement or GAAP violations can contribute to scienter, though not by itself. MTD at 28-30.

27

2007).

Each corrective disclosure revealed material facts that Defendants had previously misrepresented or concealed. *See Hall v. Johnson & Johnson*, 2019 WL 7207491, at \*27 (D.N.J. Dec. 27, 2019) (loss causation adequately pled where "each [corrective disclosure] provided new information as to the seriousness and extent of the Company's alleged fraud"). The Company's stock price declined following each corrective disclosure. ¶¶200, 202, 205. These facts are all that are required at the pleading stage. *See Hull v. Glob. Digital Sols., Inc.*, 2017 WL 6493148, at \*14-15 (D.N.J. Dec. 19, 2017) ("[T]he Supreme Court does not require that [a] corrective disclosure take any particular format; so long as the plaintiff alleges that the public disclosure reveals that the defendant company made false claims, and…a corresponding drop in stock price occurred, loss causation is adequately pled.").[20] Corrective disclosures "need not precisely mirror the earlier misrepresentation." *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at \*6 (E.D. Pa. Sept. 3, 2010).

Defendants claim that none of the three corrective disclosures corrected any prior misrepresentations or omissions. MTD at 38-39. In fact, each corrective disclosure partially revealed Party City's liquidity problems and financial reporting deficiencies, among other undisclosed issues, which corrected Defendants prior misrepresentations and omissions. *See Dura Pharm. Inc, v. Broudo*, 544 U.S. 336, 342 (2005) (Plaintiffs need only provide enough factual content to give the defendants "some indication of the loss and the causal connection that the

---

[20] The cases Defendants cite (MTD at 39) are distinguishable because the corrective disclosures were untethered from the misrepresentations. *See D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 996-97 (6th Cir. 2005) (bankruptcy was caused by factors unrelated to the misrepresentations); *Marsden v. Select Med. Corp.*, 2007 WL 518556, at \*3-5 (E.D. Pa. Feb. 12, 2007) (corrective disclosure was not related to the "improper revenue practices"); *In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, at \*3-4 (D.N.J. Aug. 26, 2005) (corrective disclosure did not reveal problems with misrepresented revenue projection).

plaintiff has in mind.").[21]

**January 6, 2023**. On January 6, 2023, *The Wall Street Journal* reported that Party City was contemplating filing for bankruptcy as the Company's "cash dwindled." ¶199. This partially corrected Defendants' misrepresentations and omissions regarding the Company's liquidity and borrowing capacity. ¶¶197-99. And partially revealed the Company's liquidity constraints, insufficient borrowings, and preparations for bankruptcy. *Id.*[22] On this news the price of the Company's stock declined by 50%. ¶200.

**January 17, 2023**. On January 17, 2023, the Company filed bankruptcy. ¶201. The bankruptcy filing partially corrected Defendants' misrepresentations and omissions regarding the Company's liquidity and borrowing capacity. *Id.* Information in the bankruptcy filings revealed in detail the Company's liquidity shortfalls, insufficient borrowings, and inability to locate lenders willing to provide additional loans. *Id.* On this news, the Company's stock declined by 67%. ¶202.

**June 9, 2023**. On June 9, 2023, the Company issued a Form 8-K revealing that the Q3 2022 10-Q contained a "material error" and needed to be "restated," correcting the Q3 2022 disclosures and omissions by disclosing that the Q3 2022 10-Q should have included a going concern warning, there was a material weakness in internal control over financial reporting at Q3 2022, and that E&Y resigned as the Company's auditor due to disagreements concerning the

---

[21] The Complaint also pleads loss causation via the materialization of risk theory. ¶¶197, 203, 206. Defendants do not challenge these allegations.

[22] Defendants claim that the allegations do not plead that the article disclosed fraud or wrongdoing. MTD at 39 n. 6. A corrective disclosure does not need to reveal the fraud and Defendants' authority does not stand for this overly restrictive proposition. Instead, that case was "devoid of any allegations that the market ever learned" of the misrepresentations and did "not adequately demonstrate a market correction…caused by [d]efendants' misrepresentations." *See Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 561 (D.N.J. 2010).

Company's Q3 2022 10-Q. ¶204. On this news, the Company's stock declined by 22%. ¶205.[23]

### E.      Control Person Liability Under Section 20(a) is Adequately Pled

"To state a claim under Section 20(a) of the Exchange Act, the plaintiff must allege: (1) an underlying [Section 10(b)] violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *Coinbase*, 2024 WL 4053009 at *18. Here, Plaintiff adequately pleads a Section 10(b) claim for the reasons addressed above. Defendants Weston and Vogensen, as CEO and CFO, controlled Party City's financial reporting and SEC disclosures as described herein. *See, e.g.* ¶¶19-21, 177-78, 235-37. Plaintiff adequately pleads Defendants' culpable participation in Party City's Section 10(b) violations.[24]

## IV.      CONCLUSION

The Court should deny Defendants' motion to dismiss in its entirety. In the event the Court grants the motion in whole or in part, Plaintiff respectfully requests leave to amend.

---

[23] Defendants vaguely claim that the disclosure of the restatement was not corrective because there were warning signs. MTD at 39. This simplistic argument ignores Plaintiff's allegations that describe the new information that was disclosed with this corrective disclosure causing a significant stock drop. *Supra* § II.D; ¶204. *See GSX Techedu Inc.*, 2024 WL 3163219 at *33-34 (finding "critical distinctions" between two reports especially "at this early stage").

[24] Defendants reference *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 2012 WL 3779309 (D.N.J. Aug. 29, 2012) for the proposition that pleading culpable participation is required. As noted in that case, there are "various decisions made by other judges in the District of New Jersey" that do not require culpable participation at the pleadings stage. *Id.* at 9. Regardless, the Complaint pleads that Defendants were culpable participants in the fraud through "either knowing and substantial participation in the wrongdoing or inaction with the intent to further the fraud or prevent its discovery." *Id. See, e.g.* ¶¶19-21, 177-78, 235-37.

Dated: September 30, 2024

Respectfully submitted,

*/s/ Michael Dell'Angelo*
Michael Dell'Angelo (Bar No. 32581997)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: mdellangelo@bm.net

*Lead Counsel for Plaintiff and the Putative Class*

Joshua H. Grabar (*pro hac vice*)
Grabar Law Office
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
267-507-6085
jgrabar@grabarlaw.com

*Counsel for the Putative Class*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2024, the foregoing was served upon all counsel of record via the Court's CM/ECF electronic filing system.

*/s/ Michael Dell'Angelo*
Michael Dell'Angelo
