## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RYAN SHULMAN, *individually and on behalf of all others similarly situated*, | Civil Action No. 23-04121 (JXN)(CF) |
| Plaintiff, | |
| v. | |
| BRADLEY M. WESTON *and* TODD E. VOGENSEN, | **OPINION** |
| Defendants. | |

**NEALS**, District Judge

Before the Court is Defendants Bradley M. Weston ("Weston") and Todd E. Vogenson's ("Vogenson") (collectively, "Defendants") motion to dismiss the Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure[1] 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u, *et seq*. (ECF No. 33.) Plaintiff Ryan Shulman ("Plaintiff") opposed the motion (ECF No. 35), and Defendants replied in further support (ECF No. 42). Jurisdiction and venue are proper pursuant to 28 U.S.C. §§ 1331 and 1391(b), respectively. The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons stated herein, Defendants' motion to dismiss is **DENIED**.

## I.    FACTUAL BACKGROUND[2]

Plaintiff brings this securities class action on behalf of those who purchased or acquired Party City Holdco Inc. ("Party City" or "Company") common stock between November 8, 2022,

---

[1] "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

[2] When reviewing a motion to dismiss, a court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

and June 9, 2023 ("Class Period"). (Am. Compl ¶ 1, ECF No. 24.) Party City was[3] a national seller of party supplies, Halloween costumes, and decorations. (*Id.* ¶¶ 29–30.)

Plaintiff alleges Party City misrepresented its deteriorating financial condition and intention to file for bankruptcy in its Form 10-Q for the quarter ending on September 30, 2022 ("Q3 2022 10-Q"), which was filed with the Securities and Exchange Commission ("SEC") on November 8, 2022. (*Id.* ¶ 2.) Plaintiff claims these misrepresentations and omissions were part of an ongoing pattern beginning with the Form 10-Q for the quarter ending on March 31, 2022 ("Q1 2022 10-Q"), continuing with the Form 10-Q for the quarter ending on June 30, 2022 ("Q2 2022 10-Q"), and culminating with the Q3 2022 10-Q. (*Id.* ¶ 2.) Plaintiff sued Party City's former Chief Executive Officer ("CEO") Weston and former Chief Financial Officer ("CFO") Vogensen.[4] Defendants oversaw the Company's financial reporting and internal controls, and signed Certifications attesting to the accuracy of the Q3 2022 10-Q. Both Weston and Vogensen resigned following Party City's bankruptcy filing. (*Id.* ¶ 12.)

A.     **The Alleged Misrepresentations and Omissions**

Plaintiff alleges the Q3 2022 10-Q was false and misleading because it: (i) affirmatively misrepresented that the Party City had enough capital resources to meet its "liquidity needs for at least the next 12 months"; (ii) omitted then-existing "substantial doubt about the Company's ability to continue as a going concern"; (iii) omitted the insufficiency of the Company's then existing credit facilities to satisfy its cash needs and the Company's inability to locate lenders willing to provide additional loans in the normal course of business; (iv) omitted the Company's

---

[3] Six months after Plaintiff filed this lawsuit, Party City announced the closure of all its stores. *See* Emmy Abbassi and Jordan Valinsky, *Party City is going out of business*, CNN (Dec. 20, 2024), https://www.cnn.com/2024/12/20/business/party-city-shut-down.

[4] Party City is not a named defendant due to its bankruptcy.

preparation for bankruptcy; (v) overstated the Company's goodwill balance[5] by $155 million and, relatedly, understated the Company's net losses by $148 million; and (vi) omitted multiple "material weaknesses in internal control over financial reporting." (*Id.* ¶ 3.)

Plaintiff alleges that on January 17, 2023—ten weeks after filing the Q3 2022 10-Q— Party City abruptly filed for bankruptcy. (*Id.* ¶ 4.) Plaintiff claims Party City went bankrupt because of "severe liquidity constraints" it did not disclose to investors. (*Id.*) Plaintiff alleges Party City "gave no advance warnings of liquidity problems or contemplation of bankruptcy." (*Id.* (emphasis omitted).)

After filing for bankruptcy, Party City's stock price fell 67% in two days, causing Class Members to lose two-thirds of the value of their Party City holdings virtually overnight. Investors lost the remainder of their Party City holdings when the Company "cancelled" all shares of its common stock without compensation or other consideration. (*Id.* ¶ 5) (emphasis omitted).

### B. The Restatement

On June 9, 2023, the last day of the Class Period, Party City admitted in a Form 8- K filed with the SEC ("June 9, 2023 Form 8-K") that the Q3 2022 10-Q contained a "material error," should "no longer be relied on," and needed to be "restated." (*Id.* ¶ 6.) The June 9, 2023 Form 8-K revealed Party City "ought to have disclosed in the [Q3 2022 10-Q] . . . that there was substantial doubt regarding the Company's ability to continue as a going concern." (*Id.*) According to Plaintiff, a going concern warning would have allowed Class Members to stop Party City stock or to sell existing shares before incurring massive losses when Party City filed for

---

[5] "When a company purchases another, it often pays more than the net fair value of the target's assets and liabilities. This excess is recorded as goodwill, an intangible asset reflecting brand strength, customer loyalty, and proprietary technology, among other factors." Marshall Hargrave, *Understanding Goodwill in Accounting*, Investopedia, https://www.investopedia.com/terms/g/goodwill.asp (last updated Aug. 15, 2025).

bankruptcy. (*Id.*). The June 9, 2023 Form 8-K also revealed that Party City's long-time auditor, Ernst & Young, LLP ("E&Y"), resigned due to disagreements with the Company regarding its treatment of the going concern issue and that a "material weakness in internal control" existed at Q3 2022, which should have been disclosed in the Q3 2022 10-Q. (*Id.* ¶ 7.)

On March 28, 2024, Party City filed a restated Form 10-Q (the "Restated Q3 2022 10-Q"), which formally added a going concern warning. The Restated Q3 2022 10-Q also revealed, for the first time, that the Company's goodwill balance was overstated by $155 million, the Company's net loss that quarter was understated by $148 million, and material weaknesses in internal control were much more widespread than originally reported in the June 9, 2022 Form 8-K. (*Id.* ¶ 8.)

Plaintiff claims Party City's bankruptcy filings indicate the Company knew about its liquidity problems before filing the Q3 2022 10-Q. (*Id.* ¶ 9.) Indeed, Party City began bankruptcy preparations before filing the Q3 2022 10-Q, which omitted any reference to those material adverse facts. (*Id.*) According to two declarations filed in the bankruptcy proceedings, Party City avoided publicly disclosing its liquidity crisis and need for bankruptcy to avoid upsetting vendors and other stakeholders. (*Id.* ¶ 10.) In particular, the Company feared vendors would impose burdensome trade terms once learning the true extent of the Company's liquidity problems. (*Id.*) Following the Company's admissions in the June 9, 2023 Form 8-K, the SEC launched a formal investigation into Party City's financial reporting, which is ongoing. (*Id.* ¶ 11.)

## II.    <u>PROCEDURAL HISTORY</u>

This class action lawsuit was originally filed on August 1, 2023. (*See* ECF No. 1.)  On April 30, 2024, Craig Wigand was appointed as Lead Plaintiff, and his counsel, Berger Montague PC, was appointed as Lead Counsel in this matter. (ECF No. 21.)

Plaintiff filed the Amended Class Action Complaint on June 14, 2024. (*See* Am. Compl.) In the Amended Complaint Plaintiff assets against Defendants violations of: Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, (Count I); and (2) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (Count II). (*See* Am. Compl.)

On August 30, 2024, Defendants moved to dismiss the Amended Class Action Complaint pursuant to Rules 9(b) and 12(b)(6) and the PSLRA (Defs.' Moving Br., ECF No. 33.) Plaintiff opposed the motion (Pl. Opp'n, ECF No. 35) and Defendants replied in further support (Defs.' Reply, ECF No. 42). The matter is now ripe for determination.

## III. ....................................................................................................................................<u>L</u>

<u>EGAL STANDARD</u>

### A.    **Rule 12(b)(6) - Failure to State a Claim**

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (abrogated on other grounds)). Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." *Id*. at 552. For a complaint to survive dismissal under this Rule, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In evaluating the sufficiency of a complaint, "[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (citations omitted). A court must only consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus*, 641 F.3d at 563. First, the Court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 675). Second, the Court must accept as true all the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler*, 578 F.3d at 210. The Court, however, may ignore legal conclusions or factually unsupported accusations that merely state that the defendant unlawfully harmed the plaintiff. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the Court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 663). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

Motions to dismiss in a Section 10(b) action similarly follow a three-step process. First, as with any Rule 12(b)(6) motion, courts must "accept all factual allegations in the complaint as true." *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Second, "courts must consider the complaint in its entirety." *Id.* Third, in determining whether the pled facts give rise to a "strong" inference of scienter, the court must assess plausible opposing inferences. *Id.*; *Cont'l Gen. Ins. Co. v. Olafsson,* No. 23-3662, 2024 WL 4263211, at *4–5 (D.N.J. Sept. 23, 2024).

**B.     The PSLRA and Rule 9**

Fraud-based claims brought under the Securities Exchange Act and alleged as part of a private securities class action, are additionally subject to the heightened pleading requirements of both Rule 9(b) and the PSLRA. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–77 (3d Cir. 2006).

Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Frederico v. Home Depot*, 507 F.3d 188, 200–02 (3d Cir. 2007) (noting that a court may grant a motion to dismiss a fraud-based claim if the plaintiff fails to plead with the required particularity). Particularity requires sufficient details to put the defendant "on notice of the precise misconduct with which [it is] charged." *Frederico*, 507 F.3d at 201 (alteration in original) (quoting *Lum v. Bank of Am.*, 261 F.3d 217, 223–24 (3d Cir. 2004) (abrogated on other grounds)) (internal quotation marks omitted). At a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background . . . [in] the first paragraph of any newspaper story—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema*, 438 F.3d at 276–77.

The PSLRA provides two distinct pleading requirements, both of which must be met for a securities complaint to survive a motion to dismiss. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Id.* at 252–53 (quoting *Winer Fam. Tr.*, 503 F.3d at 326); 15 U.S.C. § 78u–4(b)(1). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Avaya*, 564 F.3d at 253 (quoting 15 U.S.C. § 78u–4(b)(2)). *See also Tellabs*, 551 U.S. at 313 (stating that the PSLRA requires pleading both "facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'") (internal citations omitted).

Both provisions of the PSLRA require facts to be pled with "particularity." *Avaya*, 564 F.3d at 253. As such, this particularity language echoes the requirements of Rule 9(b). *Id.* Indeed, although the PSLRA replaces Rule 9(b) as the pleading standard for private securities class actions, Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by" PSLRA § 78u–4(b)(1). *Id.* (discussing PSLRA's requirement that a plaintiff plead the "who, what, when, where, and how.").

### C.    Section 20(a)

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Liability under Section 20(a) "is derivative of an underlying violation of Section 10(b) by the controlled person." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013) (quoting *Avaya*, 564 F.3d at 252). "Thus, for a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 280 (D.N.J. 2007) (citations omitted).

## IV.    DISCUSSION

Defendants argue that the Court should dismiss Plaintiff's Section 10(b) claims within the Amended Complaint because: (1) "Plaintiff does not allege an actionable misstatement or omission;" (2) "Plaintiff does not plead facts specific to each Defendant giving rise to a strong inference of fraudulent intent—scienter—as to either Defendant;" and (3) "the Amended Complaint fails to plead loss causation, *i.e.*, that the alleged misstatements caused plaintiff's losses." (Defs.' Moving Br. at 2–3.) Defendants further contend that the statements and omissions alleged by Plaintiff are forward-looking statements protected by the PSLRA's "safe harbor" provision, are "[i]nactionable" opinion statements, or are mere "puffery." (*Id.* at 18–23.)

Further, Defendants argue that Plaintiff's Section 20(a) control person claim fails for failure to sufficiently allege an underlying Section 10(b) claim or "culpable participation" by Defendants in any alleged fraud. (*Id.* at 2–3.) The Court first addresses Defendants' arguments with respect to the Section 10(b) and Rule 10b-5 claims, and the Section 20(a) claim thereafter.

### A.    Section 10(b) and Rule 10b-5 (Count I)

The Exchange Act regulates the trading of securities on the secondary market. *Slack Tech., LLC v. Pirani*, 598 U.S. 759, 763 (2023). Section 10(b) of the Exchange Act prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The SEC implemented this provision via Rule 10b-5, under which it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014) (quoting 17 C.F.R. § 240.10b-5(b)). Section 10(b) and Rule 10b-5 create a private right of action "for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation." *Gold v. Ford Motor Co.*, 577 F. App'x 120, 122 (3d Cir. 2014) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)). For the reasons discussed below, the Court finds that Plaintiff has sufficiently met these pleading requirements.

The Court addresses Defendants' arguments with respect to Section 10(b) and Rule 10b-5 in the following order: (1) materiality and misleading statements; (2) scienter; and (3) loss causation.

### i.    *Materially Misleading Statements*

For purposes of Section 10(b) and Rule 10b-5, information is "material" if it "would be important to a reasonable investor in making his or her investment decision." *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (quoting *Burlington*, 114 F.3d at 1425). Generally, undisclosed information is considered material if "there is a substantial likelihood that the disclosure would

have been viewed by the reasonable investor as having 'significantly altered the "total mix" of information' available to that investor." *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996) (quoting *T.S.C. Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). *See also Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992); *Oran*, 226 F.3d at 282. A duty to disclose an omitted material fact arises only when disclosure would be necessary to make the statement "not misleading" in "light of the circumstances under which they were made." *City of Edinburgh Council*, 754 F.3d at 174 (citation omitted). Because materiality is a mixed question of law and fact, allegations of misrepresentations or omissions are inactionable as a matter of law only if they "are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Shapiro*, 964 F.2d at 280 n.11.

"To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (citing *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 586 (D.N.J. 2001)). Furthermore, the Third Circuit has determined that "[o]pinions are only actionable under the securities laws [including Section 10(b),] if they are not honestly believed and lack a reasonable basis." *City of Edinburgh Council*, 754 F.3d at 170 (citations omitted).

Here, in accordance with the PSLRA, the Amended Complaint "specif[ies] each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Avaya*, 564 F.3d at 252–53. (*See* Am. Compl. ¶¶ 34–88.) Plaintiff puts Defendants "on notice of the precise misconduct with which [Defendants are] charged." *Avaya*, 564 F.3d at 252. *See also Frederico*, 507 F.3d at 200–02.

Recognizing that each allegedly misleading statement requires particularity, the Court considers the Q1, Q2, and Q3 2022 10-Q statements, Defendants' certifications, and Defendants' statements during the Q3 earnings call.

### a.    The Misstatements are Material

Plaintiff alleges that the Q1 2022 10-Q affirmatively stated Party City's cash on hand, cash generated from operations, and borrowings available under its credit agreements "will be adequate to meet our liquidity needs for at least the next 12 months." (Am. Compl. ¶ 35.) The Q1 2022 10-Q also claimed Party City could borrow up to $90 million. (*Id*. ¶ 36.)[6] The Q1 2022 10-Q, however, did not warn that Party City did not have enough cash or credit to meet its needs or that it was facing a liquidity shortfall. (*Id*. ¶¶ 37–38.)

Plaintiff also alleges the Q2 2022 10-Q reiterated that Party City's available funds "will be adequate to meet our liquidity needs for at least the next 12 months." (*Id*. ¶ 40.) The Q2 2022 10-Q asserted Party City could borrow up to $156.7 million. (*Id*. ¶ 41.) This disclosure also failed to provide any warning that Party City lacked sufficient cash or credit to meet its needs or that it was facing a liquidity shortfall. (*Id*. ¶¶ 42–43.)

As before, Plaintiff alleges the Q3 2022 10-Q affirmatively stated Party City's available funds "will be adequate to meet our liquidity needs for at least the next 12 months," and asserted the Company could borrow up to $91.7 million. (*Id*. ¶¶ 46–47.) It also provided no warning that Party City's liquidity was insufficient to meet its needs, that it was facing a liquidity shortfall, or that the Company had already begun preparing for bankruptcy. (*Id*. ¶¶ 48–49.) According to Plaintiff, the Q3 2022 10-Q also: (1) omitted that there was substantial doubt about the

---

[6] Courts may look beyond the pleadings upon a motion to dismiss when documents are integral to or explicitly relied upon in the complaint. *Burlington*, 114 F.3d at 1426. The Court may also properly consider SEC filings and public information capable of judicial notice. *See Tellabs*, 551 U.S. at 322; *In re NAHC*, 306 F.3d at 1331.

Company's ability to continue as a going concern (*id.* ¶ 50); (2) overstated Party City's goodwill balance by $155 million (*id.* ¶ 51); (3) stated that the Company's net loss was $237 million for the nine months ending on September 30, 2022, which was understated by $148 million due to the omission of the goodwill impairment charge[7] (*id.* ¶ 52); (4) stated that each of Defendants concluded that Party City's disclosure controls and procedures were effective (*id.* ¶ 53); and (5) omitted several then-existing material weaknesses in internal controls. (*Id.* ¶ 54.)

Defendants each signed Sarbanes-Oxley Certifications ("SOX Certifications") in connection with the Q3 2022 10-Q wherein they certified that "based on my knowledge, this [form] does not contain any untrue statements of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]" (*Id.* ¶ 167.) During the Q3 2022 Earnings Call, Vogensen allegedly stated Party City "ended the quarter with $122 million in total liquidity" and "$92 million of revolver availability." (*Id.* ¶ 171.) The Amended Complaint identifies other misstatements, but these examples are representative of all categories of misrepresentations Plaintiff alleges. (*See generally id.*)

The Court finds that the misleading statements alleged in the Amended Complaint are plausibly pled to be material—that is, important to a reasonable investor. *See Oran*, 226 F.3d at 282. Such investor would want to know the true value of a company's goodwill; whether there existed substantial doubt about the Company's ability to continue as a going concern; a company's financial projections and stability; and whether a subsequent bankruptcy is on the horizon, a critical time to be honest and transparent to investors. A reasonable investor would

---

[7] "Accounting goodwill involves the impairment of assets that occurs when the market value of an asset drops below historical cost. This happens due to events like reduced cash flow, more competition, or an economic downturn." Hargrave, *supra* note 5.

13

want an accurate depiction of a company's liquidity, borrowing capacity, and cash flow sufficiency. Plaintiff alleges that, instead, the Company painted a picture of a positive trajectory, stating affirmatively that the Company was "improving [its] liquidity position," (Am. Compl. ¶ 171), and that the Company's resources would "be adequate to meet our liquidity needs for at least the next 12 months." (*Id*. ¶ 184.) These positive statements were not accompanied by sufficient disclosures to assuage their misleading nature.

Plaintiff plausibly alleges such omissions would have "significantly altered" the information available to Plaintiff. *See Shapiro*, 964 F.2d at 280 n.11. Consequently, Defendants should have disclosed information necessitating bankruptcy preparations to sufficiently contextualize their statements regarding the Company's financial and operational status. *Industriens Pensionsforsikring v. Dickinson*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) ("Defendants may not describe a favorable picture of [a] material issue without including the details that would have presented a complete and less favorable one.") (citation omitted). In sum, none of the alleged misrepresentations or omissions "are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Shapiro*, 964 F.2d at 280 n.11. So, the misstatements Plaintiff alleges are material.

Defendants argue the statements were not actionably misleading because they are (1) protected by the PSLRA's safe harbor provision, (2) opinion, not fact, and (3) puffery.

### b.    PSLRA Safe Harbor Provision Does Not Apply

Defendants argue that many of their statements are not actionable in that they are "forward-looking" opinions protected by *Williams v. Globus Medical, Inc.*, 869 F.3d 235, 245 (3d Cir. 2017), and the PSLRA's safe-harbor provision. (Defs.' Moving Br. at 18–19.) The Court disagrees.

"In addition to establishing a heightened pleading standard, the PSLRA provides a so-called 'safe harbor' that immunizes certain 'forward-looking' statements from § 10(b) liability." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016). "The term 'forward-looking statement' is broadly defined" in the PSLRA. *Avaya*, 564 F.3d at 255. The definition captures a wide range of statements, including those "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; statements of "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; or statements of "future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [SEC]." *Id.* (quoting 15 U.S.C. § 78u-5(i)(1)(A)-(D)). "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Id.* (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II)*, 513 F.3d 702, 708 (7th Cir. 2008)). Under the PSLRA's safe harbor provision, "forward-looking" statements are not actionable if they are "(1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278-79 (3d Cir. 2010) (citing 15 U.S.C. § 78u-5(c)).

Defendants specifically challenge the statement, "we believe that these sources will be adequate to meet our liquidity needs for at least the next 12 months," and the statement, "we expect to satisfy our short-term and long-term cash requirements through a combination of our existing cash . . . and borrowing capacity." (Defs.' Moving Br. at 18–19.) Defendants contend that "these forward-looking statements were accompanied by meaningful cautionary language,

either explicitly or through incorporation of risk factors disclosed in prior filings." (*Id*. at 19.) Further, Defendants claim that the PSLRA's safe harbor provision requires dismissal of Plaintiff's claims because "Plaintiff has not adequately alleged that 'the forward-looking statement . . . was . . . made or approved by [an executive officer] with actual knowledge by that officer that the statement was false or misleading.'" (*Id*. (quoting 15 U.S.C. § 78u-5(c)(1)(B)). However, the statements cited in the Amended Complaint, when read as a whole, appear to be more than mere opinions, beliefs, or future projections of the company.

Initially, the Court agrees with Plaintiff that Defendants' use of conditional language such as "will be adequate" and "we expect to satisfy" does not unquestionably afford protection under the PSLRA's safe-harbor provision. The challenged declarations inherently contained statements of current fact regarding the sufficiency of the Company's liquidity and available borrowing capacity. *See Avaya*, 564 F.3d at 255. Additionally, Courts have held that "[a]llegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor." *In re Majesco Sec. Litig*., No. 05-3557, 2006 WL 2846281, at *4 (D.N.J. Sept. 29, 2006), (quoting *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 930 (D.N.J. 1998)). Because the statements neglect to mention, or even allude to, the Company's *current* liquidity and borrowing capacity issues or bankruptcy contemplation, the conditional language contained within is insufficient to classify the statements as forward-looking.

To the extent that these statements can be considered forward-looking, they are not accompanied by cautionary language sufficient to correct a reasonable investor's interpretation of the statements themselves. Although the Company stated that inflation and COVID-related supply chain issues could continue to impact the Company's operating results (Defs.' Moving

Br. at 7), these disclaimers say nothing to correct or contradict the positive outlook implied by the statements, nor do they inform investors that liquidity was already severely strained. *See In re Coinbase Glob., Inc. Secs. Litig.*, No. 22-4915, 2024 WL 4053009 at *13 n.19 (D.N.J. Sept. 5, 2024) ("[G]eneric warnings of a risk do not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability [of the potential risk materializing].") Further, the Company's generic language regarding the risk of relying on forward-looking statements are simply boilerplate warnings that Courts have held are insufficient to correct a reasonable investor's risk calculations. *See In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *17 (E.D. Pa. Mar. 25, 2020) ("In evaluating the meaningfulness of cautionary language, courts have rejected the alleged significance of boilerplate warnings true to every company . . . ."); *see also Kline v. First W. Gov't Sec., Inc*., 24 F.3d 480, 489 (3d Cir. 1994) ("Not just any cautionary language will trigger application of the doctrine. Instead, disclaimers must relate directly to that on which investors claim to have relied.")

Additionally, the PSLRA does not protect the statements because Plaintiff sufficiently pleads that Defendants knew the statements were false at the time they were made. For example, Plaintiff pleads facts suggesting that the Company "intentionally delayed publicly disclosing its liquidity problems, need for bankruptcy, and going concern issues due to fear of how the Company's vendors and other stakeholders would react." (Am. Compl. ¶ 74.) As previously stated, the holistic picture plausibly indicates Defendants' actual knowledge of the Company's dire financial straits, thereby removing the statements from the protection of the Safe Harbor provision. *See* 15 U.S.C. § 78u-5(c)(1)(B); *see also In re Aetna,* 617 F.3d at 285 ("The safe

17

harbor applies to statements made without actual knowledge that the statement was false or misleading.")

### c.    The Misstatement About Goodwill Was Not Mere Opinion

Defendants claim that the goodwill misstatement was an "opinion statement" and thus immune from liability. (Defs.' Moving Br. at 20.) An opinion statement can still be considered misleading if it: (i) "was not sincerely believed when made"; (ii) "contains an expressly embedded, untrue factual assertion"; or (iii) "reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023); *see also Laborers Loc. No. 231 Pension Fund v. Cowan*, 837 F. App'x 886, 891 (3d Cir. 2020) (holding liability exists if opinion "omits material facts about the . . . knowledge concerning [the] statement of opinion.").

Here, there is substantial doubt that Defendants honestly believed the stated goodwill balance was accurate or had been calculated with "the best information available." (Am. Compl. ¶ 166.) The Restated Q3 2022 10-Q affirmed that, due to the use of outdated projections, the Company's goodwill balance had been overstated by some $155 million, or 29% of the original goodwill balance. (*Id.* ¶ 99.) Defendants aver that goodwill statements are opinions because "[t]hey rest on the accounting procedures outlined by GAAP for evaluating and testing these assets, which . . . require the exercise of subjective judgment." (Defs.' Moving Br. at 20 (quoting *In re Ascena Retail Grp., Inc. Sec. Litig.*, No. 19-13529, 2022 WL 2314890, at *7 (D.N.J. June 28, 2022)).). However, several of the factors relevant to calculating goodwill, such as "limitations on accessing capital" and "contemplation of bankruptcy," directly relate to information that Plaintiff credibly alleged was available to Defendants at the time of the goodwill calculation. (Am. Compl. ¶ 112.) Yet, despite possessing sufficient information to necessitate

bankruptcy preparations prior to the Q3 2022 10-Q filing, Defendants failed to accurately disclose their goodwill impairment. Additionally, the goodwill analysis included the embedded factual assertion that it was based on "the best information available," which the Restatement revealed to be false. (*Id.* ¶ 166). Plaintiff, accordingly, has plausibly alleged that Defendants were, at a minimum, reckless in ignoring these newer financial projections, and thus cannot escape liability for the goodwill misstatement.

### d.    The Misstatements Were Not "Puffery"

Like forward-looking statements and opinions, a defendant may not be held liable for an alleged misrepresentation that consists of nothing more than vague and nonspecific expressions of corporate optimism. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999), *abrogated in part on other grounds by Tellabs*, 551 U.S. at 319–29. Such statements "constitute no more than 'puffery' and are understood by reasonable investors as such." *Id.* (quoting *Burlington*, 114 F.3d at 1428 n.14). Thus, a false or misleading statement "too vague to ascertain anything on which a reasonable investor might rely," is inactionable corporate puffery. *In re Aetna*, 617 F.3d at 284.

While puffery and corporate optimism are permissible, the Amended Complaint nevertheless sufficiently pleads a securities violation to survive the motion to dismiss stage. Plaintiff adequately alleges that many of the "optimistic" statements, when read together with the background facts, demonstrate that Defendants likely knew contradictory facts and/or acted recklessly in making such statements. Nor are the statements, as Defendants argue, "too conclusory and vague to withstand the heightened pleading burdens of the PSLRA." (Defs.' Moving Br. at 23.) For example, the statements regarding the adequacy of the Company's control and procedures are belied by the fact that the Company later admitted to "material

weaknesses in internal control over financial reporting[,]" which ultimately "resulted in material misstatements, contributing to the need for a restatement." (Pl. Opp'n at 19.) The deficiencies in these internal controls, which Defendants supposedly "designed (or had overseen the design of)" and the resultant harm caused thereby, are highlighted by the Amended Complaint with the required specificity. (*Id*. at 18.)

To a reasonable investor, the statements in the Amended Complaint imply a positive outlook and a thriving Company when, allegedly, it was not. Thus, the statements are more than mere corporate optimism, puffery, and projections about Party City's finances and profits. (*See, e.g.*, Am. Compl. ¶¶ 146–49; 150–56.) Again, the Court makes no finding or conclusion as to whether Plaintiff will ultimately succeed on the merits of his Section 10(b) and 10b-5 actions, but rather concludes that Plaintiff sufficiently pleads such to survive a motion to dismiss.

### ii.   *Scienter*

Defendants argue that Plaintiff fails to sufficiently plead scienter as to either Defendant. (Defs.' Moving Br. at 3.) "Scienter" is a pleading requirement under the PSLRA and a prima facie element of a Section 10(b) and Rule 10b-5 violation. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). To successfully establish scienter, a plaintiff must allege, with particularity, facts giving rise to a "strong inference of either reckless or conscious behavior" with respect to each act or omission. *Avaya*, 564 F.3d at 267 (quoting *In re Advanta.*, 180 F.3d at 534–35) (internal quotation marks omitted); 15 U.S.C. § 78u-4(b)(2).

Specifically, the plaintiff must show that the defendant made each challenged misrepresentation or omission either: (1) intentionally—that is, with "a mental state embracing intent to deceive, manipulate, or defraud," *see Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (quoting *Tellabs*, 551 U.S. at 319), or (2) recklessly—that is, "highly

unreasonable" conduct beyond "merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it," *In re Ikon Off. Sols., Inc.*, 277 F.3d 658, 667 (3d Cir. 2002) (quoting *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000)). *See also McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979) (adopting definition for reckless conduct associated with omissions or misstatements in the context of Section 10(b) and Rule 10b-5).

A plaintiff may establish a strong inference of scienter through allegations showing either directly or circumstantially, (1) that defendants had both a motive and opportunity to commit the fraud; or (2) conscious misbehavior or recklessness. *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 617 (D.N.J. 2023) (citing *In re Bristol-Myers Squibb Sec. Litig.*, No. 00-1990, 2005 WL 2007004, at *14 (D.N.J. Aug. 17, 2005)); *see also Rahman*, 736 F.3d at 245 ("Though it is not necessary to plead motive to establish that a defendant acted with scienter, its presence can be persuasive when conducting a holistic review of the evidence.") However, motive must be supported by facts stated "with particularity"; "[b]lanket assertions of motive and opportunity" will not suffice, and "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). To establish reckless or conscious misbehavior, a plaintiff must show that defendants either: (1) "egregious[ly] refus[ed] to see the obvious, or [failed] to investigate the doubtful," or (2) had "knowledge of facts or access to information contradicting their public statements such that defendants knew or should have known that they were misrepresenting material facts related to the corporation." *In re Interpool,*

*Inc. Sec. Litig.*, No. 04-321, 2005 WL 2000237, at *12 (D.N.J. Aug. 17, 2005) (quoting *Novak v. Kasaks*, 216 F. 3d 300, 308 (2d. Cir. 2000)).

When determining whether scienter was properly pled, courts must weigh the "plausible, nonculpable explanations for the defendant's conduct" against "inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 324. Although courts "aggregate the allegations in the complaint to determine whether [they] create[ ] a strong inference of scienter, plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases." *Winer Fam. Tr.*, 503 F.3d at 337.

Here, the Amended Complaint—when read in the "aggregate," *id.*—not only alleges facts demonstrating, at a minimum, reckless behavior on the part of Defendants, *In re Interpool*, 2005 WL 2000237, at *12, but also satisfies the pleading standard for motive by supplying "particularized allegations of a concrete and personal benefit to the individual defendants resulting from the fraud," *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 586–87 (D.N.J. 2005). The Court finds Plaintiff's inferences "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Regarding reckless or conscious misbehavior, Plaintiff alleges that Party City's bankruptcy proceedings revealed that "Defendants were aware of the Company's liquidity constraints, insufficiency of borrowings, and inability to locate lenders willing to lend additional funds before the Q3 2022 10-Q was filed," (Am. Compl. ¶ 179), and that "the Company began preparing for bankruptcy before the Q3 2022 10-Q was filed." (*Id.* ¶ 180.) Defendants did not

mention either the possibility of bankruptcy or the extent of the Company's liquidity crisis existent at the time, instead touting the sufficiency of the Company's liquidity and stating that they "expect[ed] to satisfy [the Company's] short-term and long-term cash requirements through a combination of our existing cash and cash equivalents position, funds generated from operating activities, and the borrowing capacity available under our credit agreements." (*Id*. ¶ 157.) These statements, when viewed in the context of the Company's actual financial well-being, indicate that Defendants either "egregious[ly] refus[ed] to see the obvious", or at least possessed "access to information contradicting their public statements," both of which are consistent with a finding of scienter. *See In re Interpool*, 2005 WL 2000237, at *12 (quoting *Novak*, 216 F. 3d at 308).

Despite Defendants' signed certifications stating that the Q3 2022 10-Q "did not contain any material untrue statements or omissions," and that Defendants were "responsible for establishing and maintaining disclosure controls and . . . internal control over financial reporting," (Am. Compl. ¶¶ 177–78), the Company later admitted "the Q3 2022 10-Q should have disclosed that: (i) there was substantial doubt about the Company's ability to continue as a going concern; (ii) there were multiple material weaknesses in internal control; and (iii) the goodwill balance required a $155 million write-down." (*Id*. ¶ 182.) Interpreted contextually, these facts plausibly indicate that the information underlying the reporting deficiencies in the Q3 2022 10-Q were either known to Defendants and disregarded or would have been known had Defendants chosen to "investigate the doubtful." *See In re Interpool,* 2005 WL 2000237 at *12 (quoting *Novak*, 216 F. 3d at 308).

Further evidence of reckless conduct is provided by E&Y's resignation and letter to the SEC, which stated that the Company: "(i) provided inaccurate and untimely information to E&Y; (ii) resisted evaluating whether the Q3 2022 10-Q was materially misstated in the aftermath of

the bankruptcy; and (iii) did not respond to multiple requests by E&Y for further information." (Am. Compl. ¶ 186.) Plaintiff further alleges that Defendants are directly implicated by virtue of their respective positions as "overseers of Party City's financial reporting and its relationship with E&Y." (*Id*.) The conduct described by E&Y thus lends further support to Plaintiff's contention that Defendants' reporting and disclosure deficiencies were, at a minimum, "an extreme departure from the standards of ordinary care," indicating recklessness. *Ikon*, 277 F.3d at 667 (quoting *Infinity Grp. Co.*, 212 F.3d at 192).

Plaintiff bolsters these contentions by detailing Defendants' sales of Party City stock during the Class Period, totaling 20% and 24% of Defendant Weston and Defendant Vogenson's total holdings, respectively. (Am. Compl. ¶ 141) These sales "materially exceeded the volume [of Defendants' stock sales] during the comparable pre-class period." (*Id*.)

"Ultimately, whether an individual's trading history supports or rebuts an inference of scienter is a contextual inquiry that considers the totality of the circumstances of the trades." *Industriens*, 620 F. Supp. 3d at 198 (quoting *In re Toronto-Dominion Bank Sec. Litig.*, No. 17-1665, 2018 WL 6381882, at *5 (D.N.J. Dec. 6, 2018)). Whether a sale is "unusual in scope" depends on factors such as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." *Wilson v. Bernstock*, 195 F.Supp.2d 619, 635 (D.N.J. 2002) (citation omitted).

While Defendants are correct that "routine . . . stock sales" do not necessarily indicate a desire to benefit from a Company's inflated share value (Defs.' Moving Br. at 37), Courts have considered the size and comparable volume of stock sales in determining the presence of scienter. *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 654 (E.D. Pa. 2015) (scienter found where defendant retained "a substantial percentage" of his holdings but sold 1.2

million shares for profits of $50 million); *In re Suprema*, 438 F.3d at 277 (considering the "portion of stockholdings sold" in denying motion to dismiss). Accordingly, the fact that Defendants disposed of a sizeable portion of their total holdings during a period when, as Plaintiff alleges, the Company's share value was artificially inflated due to Defendants' alleged misrepresentations and omissions, supplies a plausible explanation for Defendants' reckless or intentional misconduct. *In re Par Pharm. Sec. Litig.*, No. 06-3226, 2009 WL 3234273, at *10 (D.N.J. Sept. 30, 2009) (stock sales "in combination with [p]laintiffs' other allegations . . . reinforce the court's conclusion that the [complaint] states a claim."). While these sales may alone be insufficient to establish fraudulent intent, under a holistic review of the facts, however, they may contribute to a strong inference of scienter. *Id.*; *see also Rahman,* 736 F.3d at 245. Defendants' arguments to the contrary fail to appreciate that the Court must evaluate all inferences of scienter not in isolation, but as a whole. *Tellabs*, 551 U.S. at 322–23. Rather than relying on any one piece of information or any single event, Plaintiff alleges a pattern of conduct wherein Party City's CEO and CFO continued to make positive statements about the Company's present and future finances while omitting accurate information regarding the Company's ability to continue as a going concern; and despite knowledge of a liquidity crisis so severe as to warrant bankruptcy preparations. (Am. Compl. ¶ 3.) Plaintiff alleges more than mere failures in accounting but rather a pattern of reckless misconduct that resulted in erroneous disclosures, internal and external investigations, the resignation of the Company's auditor, and, ultimately, the resignation of Defendants themselves. (*Id*. ¶¶ 3–12.) The restatement, while not dispositive, lends itself to the theory that Defendants—whose positions necessitated intimate knowledge of "disclosure controls and procedures" (*Id*. ¶ 53)—were at least reckless in making the alleged outward representations and omissions.

Whether Plaintiff will ultimately be able to prove scienter will be borne out in discovery. At this stage of the proceedings, however, Plaintiff must only plead particularized facts to support a strong inference of scienter, which, even considering opposing inferences, the Court concludes has been done. *See Wilson*, 195 F. Supp.2d at 633.

### iii.    *Loss Causation*[8]

"In the context of Rule 10b-5 claims, the Third Circuit applies the general causation principles of tort law to the element of loss causation." *City of Warwick Ret. Sys. v. Catalent, Inc.*, No. 23-1108, 2024 WL 3219616, at *15 (D.N.J. June 28, 2024). In determining loss causation, the Court asks, "whether the misrepresentation or omission proximately caused the economic loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007). A plaintiff must show that "the revelation of [the alleged] misrepresentation or omission was a *substantial factor* in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *Id.* at 425–26 (emphasis added) (citation omitted). Loss causation focuses on "whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff." *Id.* at 425 (quoting *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006)). It is not enough for a plaintiff to show that the price of a security was artificially inflated at the time of purchase because of a defendant's misrepresentations. *In re DVI, Inc. Sec. Litig.*, No. 03-5336, 2010 WL 3522090, at *5 (E.D. Pa. Sept. 3, 2010). Rather, a plaintiff must show that "the share price fell significantly after the truth became known." *Id.* (citing *Dura*, 544 U.S. at 347); *see also In re Bradley Pharms., Inc.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (holding

---

[8] The Court applies Rule 8 rather than the heightened 9(b) pleading standard in determining loss causation. *See, e.g.*, *Dura*, 544 U.S. at 347; *Hall*, 2019 WL 7207491, at *27 (collecting cases); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 558 (D.N.J. 2010) ("Plaintiff need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss for loss causation; rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2).") (citation modified); *Hull v. Glob. Digit. Sols., Inc.*, No. 16-5153, 2017 WL 6493148, at *11 (D.N.J. Dec. 19, 2017) ("Importantly, alleging loss causation or economic loss does not require a plaintiff to satisfy the heightened pleading standard under Rule 9(b)[.]")

that plaintiffs pled sufficient facts to satisfy loss causation by alleging that the price of defendants' stocks dropped after the truth about defendants' alleged misrepresentation became known). "Courts in this district have held loss causation is adequately pled when a company's stock price declines after media reports and disclosures presented new information about the alleged fraud to the public." *City of Warwick*, 2024 WL 3219616, at *15 (citations omitted).

Importantly, "[t]he issue of loss causation is usually not resolved on a motion to dismiss." *Dudley v. Haub*, No. 11-05196, 2013 WL 1845519, at *18 (D.N.J. Apr. 30, 2013) (citing *EP MedSystems*, 235 F.3d at 884 ("Whether the plaintiff has proven [loss] causation is usually reserved for the trier of fact.")); *see also Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016) ("[Plaintiff]'s burden to plead loss causation is not a heavy one, and when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, the chain of causation is . . . not to be decided on a Rule l2(b)(6) motion to dismiss.") (citation modified).

Here, Plaintiff sufficiently pleads loss causation. Each of the disclosures described by Plaintiff—the Wall Street Journal article, the bankruptcy filing, the Form 8-K, and the Restated Q3 2022 10-Q—gradually corrected the alleged misrepresentations and omissions. For each corrective disclosure, Plaintiff alleges: (1) the information that was provided in each disclosure; (2) the ways in which each disclosure relates to the concealment or that the truth became known; and (3) that the stock prices dropped following each disclosure. Contrary to Defendants' contentions, each disclosure served to partially or totally correct Party City's prior alleged misrepresentations and omissions regarding the Company's proximity to bankruptcy and liquidity issues, among other facts. The Court finds that Plaintiff sufficiently alleges loss causation.

**B.      Violation of Securities Exchange Act Section 20(a) (Count II)**

To survive a motion to dismiss, a plaintiff bringing an action under Section 20(a) of the Securities Exchange Act must plead: "(1) an underlying primary violation by a controlled person or entity; (2) that [the defendants] exercised control over the primary violator; and (3) that the [d]efendants, as controlling persons, were in some meaningful sense culpable participants in the fraud." *Wilson*, 195 F. Supp. 2d at 642 (citation modified). Stated differently, "[l]iability under Section 20(a) is predicated upon an independent violation of [the Exchange Act] or the rules or regulations thereunder." *Id.* (quoting *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 317 (D.N.J. 2001) (internal quotation marks omitted)). Under Section 20(a), a plaintiff may bring a cause of action against individuals who control a corporation that has violated Section 10(b), 15 U.S.C. § 78t(a), but "liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya*, 564 F.3d at 252. "Section 20(a) of the Exchange Act imposes joint and several liability upon one who controls a violator of Section 10(b)." 15 U.S.C. § 78t(a); *In re Suprema*, 438 F.3d at 284 ("[P]laintiff must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws.").

Defendants argue that Plaintiff fails to plead a primary violation of Section 10(b), without which a violation of Section 20(a) fails, or Defendants' "culpable participation" in the fraud. (Defs.' Moving Br. at 40.) The Court has already found that Plaintiff sufficiently pleads a primary violation under Section 10(b). Further, the Court finds, considering Defendants' executive roles and oversight responsibilities and the red flags apparent to them, that the Amended Complaint adequately alleges Defendants' control over the Company and their potential culpable participation in the underlying violations. *See In re Merck & Co., Inc.*

*Vytorin/Zetia Sec. Litig.*, No. 08-2177, 2009 WL 2855601, at *5 (D.N.J. Sept. 2, 2009).

Accordingly, Plaintiff's Section 20(a) claim at Count II survives the motion to dismiss.

## V.    <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motion to dismiss (ECF No. 33) is

**DENIED**. An appropriate Order accompanies this Opinion.


**DATED**: December 29, 2025

HONORABLE JULIEN XAVIER NEALS
United States District Judge